RUTGERS, THE STATE UNIVERSITY, PLAINTIFF-RE-SPONDENT, v. STEPHEN PILUSO, BUILDING IN-SPECTOR OF THE TOWNSHIP OF PISCATAWAY, AND THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PISCATAWAY, DEFENDANTS-APPELLANTS, AND THE BOARD OF ADJUSTMENT OF THE TOWNSHIP OF PISCATAWAY, DEFENDANT.

Argued October 27, 1971—Decided January 24, 1972.

*Mr. Angelo H. Dalto* argued the cause for defendants-appellants (*Mr. Howard Gran,* attorney; *Mr. Dalto,* on the brief).

*Mr. Clyde A. Szuch* argued the cause for plaintiff-respondent (*Messrs. Pitney, Hardin & Kipp,* attorneys; *Mr. Szuch and Mr. G. William Sisley,* on the brief).

The opinion of the Court was delivered by

HALL, J. The question presented by this litigation is whether Rutgers, The State University, ("Rutgers") is subject to the zoning ordinance provisions of a municipality in which one of its campuses is located — here Piscataway Township, Middlesex County. Although the provision precisely involved is a limitation on the permissible number of housing facilities for student families, the broader issue necessarily present encompasses the matter of intergovernmental land use regulation in general as well as the particular status of Rutgers. The Law Division, granting Rutgers' motion for summary judgment, held that it is an instrumentality of the state and immune from local zoning enactments. 113 *N. J. Super.* 65 (1971). We certified the township's appeal while it was pending in the Appellate Division. *R.* 2:12–2.

This legal problem arises in the following panoramic context. It is well known that New Jersey has long lagged in providing public higher education facilities. To commence to meet that unquestioned need, Rutgers has expanded tremendously during the past few years in undergraduate and graduate enrollment and necessary teaching buildings, student housing and other physical facilities required for a larger university for the benefit of the people of the whole state. Further expansion in all these aspects will undoubtedly continue for many years to come. As far as the New Brunswick center of operations is concerned (two other centers are situated in Newark and Camden), the original College Avenue campus within the city is fully occupied. A second campus, which includes Douglass College and the College of Agriculture and Environmental Science, located in the southern end of the city and running over into North Brunswick Township, offers some room for expansion. But it is

apparent that the greater part of the necessary future physical growth will have to take place on the Piscataway campus, where a substantial number of new buildings and other facilities have already been erected.

That campus, across the Raritan River from the College Avenue campus, comprises many hundreds of acres and occupies almost all of the southwesterly corner of the township. It is quite set apart, physically, from other land uses and is roughly composed of two segments — University Heights and the Kilmer section — separated only by a county road. (A small portion of the Kilmer section extends into Edison Township and the Borough of Highland Park.) The University Heights area has been owned by Rutgers for many years; the Kilmer section is a recent acquisition from the federal government. It is a portion of former Camp Kilmer, a military installation during World War II.

University Heights is already rather substantially occupied by collegiate buildings and facilities. These comprise classroom and research buildings, mostly new and principally used for science and engineering studies, the College of Pharmacy, and the Medical School (now administered by a separate governing body). Also located there are the stadium, golf course and playing fields, as well as apartments and small dwellings for the housing of married students. The Kilmer section is the site of recently opened Livingston College, an undergraduate unit of the university; the rest of its very sizeable area is largely vacant land where most future expansion will have to take place.

The township as a whole is a large, sprawling area — until fairly recently mostly unimproved land with few centers of population, but now, typical of so many such municipalities in the northeastern New Jersey suburban ring, in the throes of extensive development of all kinds. Many housing developments, a few garden apartments, and a very considerable number of industrial establishments adjacent to new Interstate Highway Route 287 have come in, and there is room for a lot more of each. This growth has neces-

sitated great extensions of municipal services and facilities, including schools, which must be principally financed, under New Jersey's present tax system, out of local property taxes. The result has been financial and other growing pains.

The township's present zoning ordinance, enacted in 1964, along with amendments thereto, reflects the usual means employed by this type of municipality in attempting to meet local financial problems by land use regulation, *i. e.,* so-called "fiscal zoning." The legally dubious stratagems of zoning wide expanses of vacant land for industrial use only, requiring large lots for undeveloped residential land, and rigidly regulating multi-family dwellings are all utilized to restrict private growth to land uses which will produce few school children and show a "tax profit."

Also included in the ordinance are detailed regulations of all of Rutgers' lands. They are placed in and comprise most of the area of an education and research zone (E–R). Permitted uses are "educational and research activities and related service activities" conducted by non-profit public and private educational institutions and by "scientific or research laboratories of private corporations, institutions, or other agencies" together with accessory uses, as well as uses allowed in the highest residential zone. Accessory uses are spelled out in considerable detail, as are minimum lot size, setback, first floor building area and percentage of lot coverage requirements. It may be observed in passing that while these detailed regulations are pertinent with respect to a private research enterprise, they are not physically suited to a vast university complex comprising dozens of buildings and allied collegiate uses on huge tracts of land having their own private interior roads. (The record does not disclose whether they were insisted upon or complied with in connection with the previous erection of university buildings and facilities.)

The ordinance provision here precisely involved is found among the permitted accessory uses in the E–R zone and reads as follows:

Dormitories for matriculated students; dormitories and other housing facilities for use by matriculated students and their families, provided, however, that such facilities do not exceed 500 units.[1]

In other words, the township purported to allow unlimited housing facilities for unmarried students, but to arbitrarily restrict the number of those which could be used by married students and their families.

In 1969 Rutgers had reached the maximum of 500 student family housing units in Piscataway. It sought to build 374 more garden apartments in the middle of the Kilmer section (together with an additional number in adjacent Edison Township.) Building permits were refused because of the ordinance restriction. The university then sought a variance, which the Board of Adjustment denied.

Rutgers thereupon started the instant suit. Originally it asserted three claims for relief: one, to compel grant of the variance; two, to declare the ordinance restriction invalid; and three, to declare Rutgers, as an instrumentality of the state, not subject to a local zoning ordinance. The variance aspect was remanded for further evidence before the township agency. When that was completed, Rutgers abandoned the first two claims and successfully moved in the trial court for summary judgment on the third, thereby producing the ruling now on review. The trial judge had before him on that motion the evidence developed before the Board of Adjustment, as do we.

Rutgers' proofs demonstrated the public need for the proposed housing beyond question, although in the view we take

---

[1]In addition to general area and setback requirements previously mentioned, the E–R zone provisions also contain some special building limitations applicable to principal and accessory buildings, among which is the following pertinent to housing facilities:

No window in any building designed for human residency shall be located so that such window is less than 25 feet distant from the wall of any opposing building not devoted to residential uses or 60 feet from any building devoted to residential uses; or less than the distance from the lowest level of the window to the maximum height of the wall in which the window is located, whichever distance is the greater.

of the case that matter is of little relevance. These proofs showed that, as of the time of the agency hearing, there were almost 10,000 full and part-time students enrolled on the New Brunswick campuses, and that the enrollment there is expected to increase to something over 19,000 by 1980. The present number of full-time graduate students is 1,788, of whom about half are married, and the projected number in 1980 is about 5,900, of whom again approximately half will be married. Graduate students, for whom the planned garden apartments are primarily designed, play an indispensable role in assisting in undergraduate instruction and will not come to this institution absent available accommodations for themselves and their families. There is already such a shortage of facilities for this purpose that all the proposed units will be immediately used. It is estimated that a minimum of 1,500 apartments will be required for such purposes by 1980.

The local interest which may be said to constitute the reason for the detailed zoning regulation of Rutgers' lands is in one respect somewhat difficult to fathom and in another, quite obvious. The campus is physically well insulated and substantially self-sufficient from the municipal service point of view. Reference has already been made to the interior roads constructed and maintained by the university. It has its own police force for routine purposes (see *N. J. S. A.* 18A:6–4.2 to 4.11). At oral argument, counsel for the township agreed that the only municipal services it had to furnish were fire protection and access roads. The presence of the campus in the township nonetheless does have a local impact. For one thing, municipal traffic policing is undoubtedly required outside the tracts by reason of the thousands of students and staff using the campus as well as by attendance of the public at events held on the grounds. This and other peripheral consequences may well be the reason for the municipality to attempt to regulate even non-residential growth on the campus by zoning regulations. Perhaps the greatest impact is the exemption from property taxation of

hundreds of acres of prime land which would otherwise produce local tax revenues.[2] But zoning regulation obviously cannot cure that consequence. We fully recognize the fiscal problem that exists, so long as our present municipal property tax structure remains, in municipalities having large governmental or other exempt installations and land ownerships. However, relief on this score can only be financial and has to come from the Legislature.

As to university residential growth, the reason for the 500 unit limitation on student family housing is made exceedingly plain by the township's evidence and the discussions at the Board of Adjustment hearings. That reason is "fiscal zoning" in its most baneful aspect. The township fears that if the 500 unit limitation does not stand and the university ultimately builds the number of student apartments it now estimates will be needed within the next few years, the township will be required to build a new elementary school to accommodate the increased number of children of married students who will live in them. And such construction will, of course, under the present fiscal scheme, have to be at the expense of Piscataway taxpayers.[3] While this result may be burdensome to property owners, as it is in the case of providing education for children from private housing, resi-

---

[2] We are advised that the university does pay annual taxes to the township on the stadium and golf course presently amounting to $212,000. We also understand that the university pays to the township each year by agreement an additional $49,000.

[3] At the time of the hearings there were 104 school children living on the campus who went to township schools. While some effort was made to show that the education of these children was presently costing the township money, this would seem not to be so when the whole scene is surveyed. Besides the annual revenues paid by the university to the township (see footnote (2)), with very few municipal services being required by the university lands, the township Board of Education receives additional state aid for these children, now amounting to something over $200 per pupil per year, under legislation so providing with respect to pupils living in school districts as residents on property owned by the state. *N. J. S. A.* 18A:58–5.1 to 5.4.

dential limitations imposed for such a reason may well be beyond the bounds of legitimate land use regulation.

From what has been said so far, it is apparent that municipal zoning regulation of state university property can, and in the case before us certainly would, very materially interfere with the development and growth of the institution, for the benefit of all the people of the state, as planned and felt necessary by the educational authorities. As the trial court commented: "The absence of immunity would result in local municipalities controlling virtually every decision concerning physical development of the University." (113 *N. J. Super.* at 71). In this connection, the township's brief projects the astonishing point of view that in its opinion public collegiate education in this state needs more classrooms rather than additional student housing facilities.

The question of what governmental units or instrumentalities are immune from municipal land use regulations, and to what extent, is not one properly susceptible of absolute or ritualistic answer. Courts have, however, frequently resolved such conflicts in perhaps too simplistic terms and by the use of labels rather than through reasoned adjudication of the critical question of which governmental interest should prevail in the particular relationship or factual situation. See the comprehensive discussion in Note, "Governmental Immunity from Local Zoning Ordinances," 84 *Harv. L. Rev.* 869 (1971).

Thus, speaking generally, black letter law frequently says: "Absent a waiver expressed by, or necessarily inferred from, the language of a state statute, a state is not amenable to the zoning regulations of its political subdivisions" and "[a] public corporation or authority created by the state to carry out a function of the state is not bound by local zoning regulations," 2 Anderson, *American Law of Zoning* § 9.06 at 115, 117 (1968), thereby turning the matter on the scope of the political authority of the governmental unit seeking exemption. Often the decision is reached on the basis of whether the function, use or activity as to which

exemption is claimed is "governmental" or "proprietary." Whether the claimant has been granted the right of eminent domain has been found to be conclusive in some cases.

Our own prior cases in the field, while referring to some of these considerations, cannot be said to have adopted any absolute criteria as decisive. Brief mention may be made of our leading decisions. In *Hill v. Borough of Collingswood*, 9 *N. J.* 369 (1952), a county park commission was held not to be subject to the provisions of a municipal zoning ordinance permitting only residential uses in the area covered by the park, on the thesis that dual land use control "is at variance with the evident sense of the legislative expression" and "would militate against the fulfillment of the basic statutory policy" in authorizing a county park for the use of all the county's residents. (9 *N. J.* at 375). In *Town of Bloomfield v. New Jersey Highway Authority*, 18 *N. J.* 237 (1955), a state agency empowered to construct and operate a toll parkway running the full north-south length of the state was held immune from the zoning enactments of a municipality through which it passed and entitled to erect an adjacent food and motor vehicle service area in a residential zone. The court found the parkway to be an essential governmental function and a facility for the use of the people of the whole state which the Legislature could not have intended to be restricted by the enactments of the municipalities along its route. (See, to the same effect, *City of Newark v. New Jersey Turnpike Authority*, 7 *N. J.* 377, 387 (1951), a non-zoning case, where a municipal attack on the local route and method of construction of a statewide toll road was rejected as in direct conflict with the very concept of a turnpike designed to serve the best interests of the entire state.)

In *Aviation Services v. Board of Adjustment of Hanover Township*, 20 *N. J.* 275 (1956), the Town of Morristown had established a municipal airport in Hanover Township pursuant to legislation authorizing such a municipal enterprise within or without the boundaries of the municipality

creating and operating it. The township's effort to prevent
expansion of the airport by zoning the land against such a
use was held ineffective because it would thwart the legis-
lation's design and purpose.[4] *Washington Township v. Vil-
lage of Ridgewood,* 26 *N. J.* 578 (1958), also involved a con-
flict between two municipalities. Ridgewood sought to erect
a water storage tank on residential lands in Ho-Ho-Kus
under legislation authorizing the location of municipal water
facilities outside the boundaries of the municipality operat-
ing the system. Chief Justice Weintraub rejected the gov-
ernmental-proprietary distinction (as had also been done in
*Bloomfield*) and held Ridgewood was not bound by the use
restrictions of the zoning ordinance of Ho-Ho-Kus. He
found, however, (as to which more *infra*) that Ridgewood
had been arbitrary and unreasonable, from the standpoint of
impact upon legitimate local interests in Ho-Ho-Kus, in the
selection of the proposed site and in the type of storage fa-
cility constructed, and its demolition was ordered.

█ The rationale which runs through our cases and which
we are convinced should furnish the true test of immunity
in the first instance, albeit a somewhat nebulous one, is the
legislative intent in this regard with respect to the particular
agency or function involved. That intent, rarely specifically
expressed,[5] is to be divined from a consideration of many
factors, with a value judgment reached on an overall evalua-

---

[4]By way of dictum, in referring to *Hill* and *Bloomfield*, the court
commented that a presumption of immunity is intended, absent ex-
press statutory language to the contrary, where the immunity is
claimed by an agency or authority occupying a superior position in
the governmental hierarchy. (20 *N. J.* at 282). We do not read this
statement to be a commitment that immunity must be granted
whenever that superiority exists.

[5]In only one case has this court held that the Legislature did
not intend immunity. That is *Township Committee of Township of
Denville v. Board of Education of Vocational School in County of
Morris,* 59 *N. J.* 143 (1971). There a majority of the court found
that a county vocational school was subject to the use limitations
of a municipal zoning ordinance by reason of the legislative intent
to that effect derived from an amendment to the zoning enabling act,
*N. J. S. A.* 40:55-33.1.

tion. All possible factors cannot be abstractly catalogued. The most obvious and common ones include the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests. (Compare the five criteria composed by the trial court in this case. 113 *N. J. Super.* at 70–71.) In some instances one factor will be more influential than another or may be so significant as to completely overshadow all others. No one, such as the granting or withholding of the power of eminent domain, is to be thought of as ritualistically required or controlling. And there will undoubtedly be cases, as there have been in the past, where the broader public interest is so important that immunity must be granted even though the local interests may be great. The point is that there is no precise formula or set of criteria which will determine every case mechanically and automatically.

With regard to a state university (passing for the moment the matter of any peculiar status of Rutgers), there can be little doubt that, as an instrumentality of the state performing an essential governmental function for the benefit of all the people of the state, the Legislature would not intend that its growth and development should be subject to restriction or control by local land use regulation. Indeed, such will generally be true in the case of all state functions and agencies.

█ It is, however, most important to stress that such immunity in any situation is not completely unbridled. Even where it is found to exist, it must not, as this court said in *Washington Township v. Village of Ridgewood, supra* (26 *N. J.* at 584–586), be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interests. This rule must apply to the state and its instrumentalities as well as to lesser governmental entities entitled to immunity. For example, it would be arbitrary, if

the state proposed to erect an office building in the crowded business district of a city where provision for off-street parking was required, for the state not to make some reasonable provision in that respect. And, at the very least, even if the proposed action of the immune governmental instrumentality does not reach the unreasonable stage for any sufficient reason, the instrumentality ought to consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible. See *Town of Bloomfield v. New Jersey Highway Authority, supra* (18 *N. J.* at 248). As far as Rutgers' proposal here, to erect the student family housing on the Kilmer tract, is concerned, we fail to see the slightest vestige of unreasonableness as far as Piscataway's local interests are concerned or in any other respect. (The university did present the proposal to the local authorities by its variance application.) The possible additional local cost of educating children living in the housing is clearly not a legitimate local interest from any proper land use impact point of view.

This brings us to the final point in the case, upon which the township principally relies. It urges in effect that under the "Rutgers, the state university law," *N. J. S. A.* 18A:65–1 to –35, *L.* 1956, *c.* 61, the entity thereby created is not such an instrumentality of the state as to qualify it for immunity from local land use regulation on that basis. The contention appears to be that only a contract relationship was thereby established between the state and the Board of Trustees of the prior institution and that the Legislature did not intend to confer immunity. The point confuses the *method of creation* of Rutgers, as the state university, which was by legislative contract, with the *nature of the entity that resulted,* from the standpoint of the problem before us.

A brief bit of history is first in order. (The full story of Rutgers is told in the opinion of Justice (then Judge) Schettino in *Trustees of Rutgers College in New Jersey v.*

*Richman,* 41 *N. J. Super.* 259 (Ch. Div. 1956) — a suit for declaratory judgment and instructions by the Trustees of the prior institution, in which the only issues were the constitutionality of the 1956 law and the power of the Trustees to acquiesce in the reorganization of the institution provided for by that act.) Although Rutgers remained a private institution managed and operated by the Board of Trustees of Rutgers College in New Jersey until 1956, it had had substantial governmental financial connections since it became the state's land grant college in 1864. This included not only federal aid as a land grant institution, but also, commencing in the early part of this century, substantial state appropriations for both operating and capital expenditures designated for particular purposes or segments of the university, which need not be recounted in detail. This conglomeration of private and public funds and facilities first resulted in *L.* 1945, *c.* 49, which designated the whole "as the State University of New Jersey to be utilized as an instrumentality of the State for providing public higher education and thereby to increase the efficiency of the public school system of the State." (*L.* 1945, at 127). That statute, in effect, provided for a purely contractual arrangement between the Trustees and the state whereby the state bought collegiate educational services from the Trustees in return for annual appropriations to the institution by the Legislature in an amount to be agreed upon each year, with the Trustees given full operational responsibility, as well as custody and control of state property in the university complex, under visitorial general powers of supervision of the State Board of Education. Whether the form of institution and arrangement thereby created, *i e.,* still a private institution under private management and control, was immune from local land use regulations need not be considered.

The 1956 act provided for the creation, by contract between the Trustees and the state, of an entirely different kind of entity and arrangement. At the time of the adoption of the statute the institution represented an even

greater and more complex conglomeration of public and private assets, physical and financial, than existed when the 1945 statute was enacted. The large investment of state monies both previously and in the eleven year interim dictated the need for public rather than private control. At the same time the private properties and funds held by the Trustees were so intermixed, in the operation of the entire institution, with those derived from state appropriations that the university could not be conducted without the use of both the public and private assets. Separation was practically impossible. And there was a general demand for a true state university, with financial and other potentialities sufficient to meet present and future needs of the state. Also the Trustees could not, consistent with their general and special trust obligations with respect to the private assets, simply turn them over to the state.

The solution provided by the statute, which became a consummated contract by the acquiescence of the Trustees following the decision of the Chancery Division heretofore mentioned, was a unique one. A Board of Governors was created, with the majority of its members state appointed, and was given full authority and control over all aspects of the conduct and operation of the university, subject to collaboration in budget aspects with and to the general visitorial powers of the State Board of Education (now the State Board of Higher Education). *L.* 1956, *c.* 61, §§ 7, 18, *N. J. S. A.* 18A:65–14, –25. The old Board of Trustees remained, augmented by the state appointed Governors as additional members, but with practically no powers as far as the running of the institution is concerned. While they are to act "in an overall advisory capacity," *L.* 1956, *c.* 61, § 19(I)(1), *N. J. S. A.* 18A:65–26(1), must concur in the Board of Governors' election of a new President, *L.* 1956, *c.* 61, § 27 (c), *N. J. S. A.* 18A:65–31c, and appoint from their membership a minority of the members of the Board of Governors, *L.* 1956, *c.* 61, § 7(b)(ii), *N. J. S. A.* 18A:65–14(b) (ii), their principal function is to retain title to and to con-

trol, pursuant to general or special trust obligations, properties, funds and trusts vested in them at the effective date of the new institution (then valued at approximately $50,000,000) or subsequently vested in them by specific designation. They must, however, make available to the Board of Governors the income from such funds and the use of or income from such properties, *L.* 1956, *c.* 61, § 19(I)(2), *N. J. S. A.* 18A:65-26(2), for appropriation and use by the Governors for the general purposes of the institution subject to any special terms legally applicable thereto, *L.* 1956, *c.* 61, § 18(3) and (4), *N. J. S. A.* 18A:65-25(c) and (d). The Trustees' absolute obligation in this regard is limited only by the reservation of their right to withhold or withdraw the use of these private properties and funds, but only with court approval, if certain underlying commitments, relating generally to the proper continuance of the university in accordance with the provisions of the statute, fail to be maintained. *L.* 1956, *c.* 61, § 20(II), *N. J. S. A.* 18A:65-27(II). Parenthetically, it may be observed that this right of withdrawal is more theoretical than realistic, since it would seemingly be an impossible task to unscramble the conglomeration, and any court to which the matter was presented would quite likely require the state to specifically perform these commitments rather than direct a separation.

The overall result of the legislative contract therefore is an autonomous public university — not merely a contractual relationship or an institution both public and private at the same time. This conclusion is further buttressed by several additional expressions in the act. The institution is specifically designated as "the instrumentality of the state for the purpose of operating the state university," *N. J. S. A.* 18A:65-2. The public policy of the state is expressly declared to be, indicative of an intent to create a full-fledged state agency, that:

a. The corporation and the university shall be and continue to be given a high degree of self-government and that the government and

conduct of the corporation and the university shall be free of partisanship; and

    b. resources be and continue to be provided and funds be and continue to be appropriated by the state adequate for the conduct of a state university with high educational standards and to meet the cost of increasing enrollment and the need for proper facilities. (*N. J. S. A.* 18A:65–27(I)).

Most significantly for present purposes, these governmentally autonomous powers are directed to be exercised "without recourse or reference to any department or agency of the state, except as otherwise *expressly* provided by this chapter or other applicable statutes."[6] (Emphasis added) *N. J. S. A.* 18A:65–28. And finally, it is provided that the act,

    . . . being deemed and hereby declared necessary for the welfare of the state and the people of New Jersey to provide for the development of public higher education in the state and thereby to increase the efficiency of the public school system of the state, shall be liberally construed to effectuate the purposes and intent thereof. (*N. J. S. A.* 18A:65–9).

    The whole picture demonstrates to us beyond any doubt that the Legislature must be said to have intended that the growth and development of Rutgers, as a public university for the benefit of all the people of the state, was not to be thwarted or restricted by local land use regulations and that it is immune therefrom. In this respect it is a statewide facility entitled to the same protection from local enactments as the turnpike and the parkway, so long as it does not act unreasonably or arbitrarily. The township urges that the failure to grant the university the power of eminent domain and the omission from the statute of a provision that all other inconsistent laws should be deemed inapplicable compel a contrary conclusion. As previously indi-

---

    [6]Rutgers has accordingly been held not subject to public bidding statutes applicable to state departments generally. *Rutgers, The State University v. Kugler,* 110 *N. J. Super.* 424 (Law Div. 1970), *affirmed o. b.* 58 *N. J.* 113 (1971); *Richardson Engineering Co. v. Rutgers, The State University,* 51 *N. J.* 207 (1968).

cated, the absence of the right of eminent domain is not decisive. The quoted provision from *N. J. S. A.* 18A:65–28 that the powers granted by the act may be exercised without recourse or reference to any department or agency of the state (which we take it includes municipal corporations), except as otherwise expressly provided, amounts to the same thing as an inconsistent law provision if, indeed, it is not even stronger.

A procedural item deserves passing mention. The claim for relief here sought a declaratory judgment. The matter was disposed of by the granting of Rutgers' motion for summary judgment. The judgment entered states only that "Plaintiff's Motion for Summary Judgment . . . be and the same is hereby granted." A judgment in a declaratory judgment action, no matter by what mechanics the case is decided or whether plaintiff or defendant is the winner, should spell out in detail the affirmative or negative declaration which the court is making. Although failure to do so is not error if the details of the adjudication can be clearly ascertained from the court's findings in the record (here by the trial judge's opinion), good practice dictates that such a judgment should so specify. See 4 *New Jersey Practice,* Marsh and Fischler, Practice Form § 1681 (1960); 22 *Am. Jur. 2d,* Declaratory Judgments, § 99 (1965); 26 *C. J. S.* Declaratory Judgments § 161 (1956); *City of Quincy v. Sturhahn,* 18 *Ill. 2d* 604, 165 *N. E. 2d* 271, 275 (1960); *Connolly v. Great Basin Insurance Co.,* 5 *Ariz. App.* 117, 423 *P. 2d* 732, 736 (1967).

The judgment of the Law Division is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*For reversal*—None.