171 N.J. Super. 287 (1979)
408 A.2d 832
PEMBERTON TOWNSHIP ET AL., PLAINTIFFS,
v.
STATE OF NEW JERSEY ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Burlington County.
Decided September 12, 1979.
*288 Mr. Donald E. Williams for plaintiffs (Messrs. Polino & Williams, attorneys).
*289 Mr. Jeffrey Jones, Deputy Attorney General, for defendants State of New Jersey and Thomas Lynch, Commissioner (Mr. John J. Degnan, Attorney General, attorney).
Mr. John E. Queenan for defendants, Goodman.
HAINES, J.S.C.
New Jersey produces 83,000 juvenile delinquents plus 11,000 juveniles in need of supervision annually. A "juvenile delinquent" is one who commits an act which, if committed by an adult, would constitute a homicide, treason, a high misdemeanor or misdemeanor, a disorderly persons offense, or a violation of any penal statute, ordinance or regulation other than violation of the motor vehicle statutes. N.J.S.A. 2A:4-44. A "juvenile in need of supervision" is one who is habitually disobedient to parents or guardians, ungovernable or incorrigible, habitually and voluntarily truant from school or who has violated a statute or ordinance applicable only to juveniles. N.J.S.A. 2A:4-45. Our courts send approximately 100 juvenile delinquents to the Training School for Boys  Skillman, each year. Skillman maintains an average population of 135 delinquents ranging in age from eight to 13 years. Interest in improving rehabilitation prospects for these children led to the adoption of a program by the New Jersey Department of Corrections, under which Skillman operates, which would place them in settings free from institutional connotations. Under it homes were to be established in communities throughout the State in which small groups of deserving boys, carefully selected from the Skillman population, would be housed with surrogate parents in a setting as close to that of a biological family as possible.
In the summer of 1978 Thomas Lynch, Assistant Commissioner of the Department of Corrections, learned of a large dwelling (the Goodman property) for sale at New Lisbon, in Pemberton Township, Burlington County, New Jersey. He visited the property on September 9, 1978, and on September 20, 1978 met *290 the mayor of Pemberton Township and its administrator to discuss its possible purchase. At that time he was considering a use of the property for delinquent girls. These officials were "dead set" against the proposal, and Lynch thereafter decided that the plan was not feasible. On September 28, 1978 he conceived the idea of using the Goodman property for the children at Skillman and started machinery in motion for the acquisition of the dwelling.
The Department was under considerable pressure with respect to this acquisition since it was to be sold at public auction on October 16, 1978, and it was only on October 10, 1978 that the purchase was approved. On that date Harold T. Miller, a project coordinator for the Department, was instructed to inspect the property and test community reaction. Miller, provided with only skeletal information about the project, inspected the dwelling and visited various areas of the township. By prior arrangement, he met with the mayor, the secretary of the zoning and planning boards, the tax assessor and the community planner to discuss the program. These officials expressed concern about the introduction of juvenile delinquents into their community. They exposed township problems, including the delinquency of its resident juveniles, declining tax ratables, rising unemployment and welfare dependency. Miller then spoke with three persons living near the house to be acquired, two of whom indicated no objections, while one objected strongly. The postmaster was consulted and expressed opposition. The Goodmans, who were selling the house and still lived there, were favorably inclined and permitted Miller to see the interior of the house, which impressed him favorably. His visit lasted 4 1/2 hours. Zoning problems were not discussed with anyone. His recommendation to the Department was "pretty neutral." Later, Lynch spoke to a neighbor of the Goodmans, who had not been reached by Miller, and was met with opposition to the project. On the morning of the auction he called the mayor and told him that the State would bid on the property. It did so successfully and now holds title. Its proposed use of the property *291 has never commenced, however, having been restrained by this court.
The Department witnesses admitted that they gave no consideration to the township's zoning, site plan and subdivision ordinances, or to its master plan, proceeding under the impression that the State was immune from such restrictions. These ordinances were never read, never reviewed with anyone. There were no discussions of any kind with the planning board, the zoning board, the township committee, the police department, the board of education, civic organizations or the township's juvenile aid office. After the purchase a public meeting was held by Department officials and attended by about 20 residents opposed to the intended use of the property. The record does not indicate any discussion of zoning at that meeting, a meeting which was described as "hostile."
The Department has not adopted any regulations concerning its new program, although it has done so with reference to various other institutions which it directs. Consequently, the only description of the program is found in a grant application to the State Law Enforcement Planning Agency submitted on January 12, 1979, amplified by trial testimony. The plan would place a maximum of eight children, ages eight to 13, in the Goodman home, placement being limited to those boys who can "constructively attend the local public schools." Boys to be excluded are those who
(1) are severely emotionally disturbed or retarded;
(2) involved in homicide, arson, rape, extremely aggressive behavior, or other serious offense;
(3) engender intense community reaction;
(4) are not appropriate for placement in residential home environment, and
(5) cannot accommodate to the community school program.
Skillman will retain jurisdiction over the home and its residents. Any boy who becomes a community problem will be returned immediately to that institution. Two house parents, *292 trained in social work, will complement the family setting. The children will participate in community affairs to the extent possible, and will attend the Pemberton public schools.
College students from the nearby Burlington County Community College will be hired on a part time basis to assist the house parents. The Department of Corrections will monitor the number of boys placed in the program and participate in a determination of its effectiveness. Primary responsibility for operating the project will reside in the Superintendent of Skillman; its staff will provide back-up assistants and a social worker.
The Goodman property consists of 4 1/2 acres of land and a large dwelling located in what is described as the best residential area of the township. It is zoned for residential uses. Neighboring houses are substantial, traditional and well kept. A number of neighbors testified at the trial; all were opposed to the project.
The township is a conglomeration of 13 small settlements producing an aggregate population of about 30,000 people. Substantial portions of the municipality are devoted to public uses: a juvenile detention center, a JINS shelter, a drug treatment center, a work release facility, a home for the aged, a home for the mentally incompetent and a Community College, all county institutions. State, county and federal entities own 9,690 acres of its land. It is burdened with the largest incidence of juvenile delinquency in Burlington County and has established its own center for handling juvenile problems. Except for the area in which the State proposes to establish its program, Pemberton Township's communities consist of modest residences and commercial establishments in essentially rural settings, frequently on lakes and streams. There is little industry. The township population has been swelled for many years by military personnel from Fort Dix and Maguire Air Force Base, which adjoin. Fort Dix activities are now much diminished; the abandonment *293 of that facility is anticipated, with consequent economic problems.
Pemberton has paid careful attention to zoning and planning concerns. It has retained a planning consultant for some years. A master plan has been adopted and implemented by zoning, subdivision and site plan ordinances.

Jurisdiction
At the inception of this suit the State moved for dismissal of the action or its transfer to the Appellate Division on the ground that the Law Division lacked jurisdiction. It sought relief under R. 2:2-3. The motion was denied. The State continues to press the point.
In denying the motion I relied upon Colon v. Tedesco, 125 N.J. Super. 446 (Law Div. 1973), an action against the Department of Labor and Industry and others relating to the alleged improper operation of migrant labor camps. In Colon the Appellate Division held that there was jurisdiction in the Law Division because the suit sought the performance of mandatory, statutory functions  in effect, ministerial acts. Further, there was no machinery in the Department for creating a record upon which review by the Appellate Division could rest. See also, Pfleger v. N.J. State Highway Dep't., 104 N.J. Super. 289 (App. Div. 1968), and Princeton First Aid v. Civil Rights Div., 124 N.J. Super. 150 (App.Div. 1973). Like the Department of Labor, the Department of Corrections has no procedures which permit a record of its undertakings to be made for appellate review purposes. In addition, plaintiffs, among other things, seek a judgment directing appropriate consideration by the Department of local concerns before proceeding with its intended use, a mandatory, ministerial function under Rutgers v. Piluso, 60 N.J. 142 (1972). The court's jurisdictional position also finds support in Rutgers v. Piluso; Berger v. State, 71 N.J. 206 (1976); Garden State Farms, Inc. v. Bay, 77 N.J. 439 (1978), and Long Branch v. Cowan, 119 N.J. Super. 306 (App.Div.) certif. den. 62 *294 N.J. 86 (1972). In all of these cases suits were commenced in the Law Division, the jurisdiction of which was recognized implicitly, though not discussed in the opinions.

The Zoning Ordinance
The Goodman property is situate in a residential zone of Pemberton Township. The zoning ordinance contains the following definitions:

Dwelling, Detached: a building physically detached from other buildings or portions of buildings which is occupied or intended to be occupied for residence purposes by one housekeeping unit and which has its own cooking, sleeping, sanitary and general living facilities.

Dwelling Unit: A room or series of connected rooms containing living, cooking, sleeping and sanitary facilities for one housekeeping unit. The dwelling unit shall be self-contained and shall not require the use of outside stairs, common hallways, passing through another dwelling unit or other indirect route(s) to get to any portion of the dwelling unit nor shall there be shared facilities with another housekeeping unit.

Housekeeping Unit: One or more persons living together in a dwelling unit on a non-seasonal basis and sharing living, sleeping, cooking, and sanitary facilities on a non-profit basis.
These definitions are legally acceptable and enforceable under our cases. State v. Baker, 81 N.J. 99 (1979); Berger v. State, supra.
There need be no further consideration of zoning problems in connection with this matter if the State's proposed use of the property is permitted by the language of these definitions. It is the intention of the Department to establish a group living arrangement resembling a home and family as closely as possible. There will be two parents, still our most frequently encountered family setting, with not more than eight young children, all of whom will live together and participate in community affairs in the same manner as children in any community. Unquestionably, as the State points out, the ordinance would permit the Goodman home to be occupied by a biological family *295 of more than eight children and by a family containing more than eight adopted or foster children. Is the State's proposed arrangement distinguishable?
A literal reading of the definitional phrases supports the State's position that the use is permitted. However, words in an ordinance or a statute must be read in the context of the complete enactment, and consideration of intent is paramount, Glick v. Newark Free Public Library, 2 N.J. 579 (1949); N.J.S.A. 1:1-1. The home to be established under the Department's program is experimental, its content, scope and management undefined by any regulations. It is part of a correctional undertaking. The children who will occupy the home are juvenile delinquents who would have been charged with criminal acts had they been adults when these acts were committed. They are more than juveniles in need of supervision. The boys to live at the home are to be selected from a limited population at Skillman, a population made up of children for whom our juvenile courts could find no alternative residential arrangement in their own communities. The home itself will be staffed, supervised and visited by Department and Skillman personnel. The Superintendent of Skillman will have the final authority with respect to its operation. The children will be returned to Skillman if they develop problems. They will reside in the community, normally, for six to 18 months. The house staff will consist not only of house parents but also of six part-time college assistants. They are not the handicapped children considered in Berger v. State, supra; the children who will live at New Lisbon face different problems which affect the community differently. Every one of them will have been adjudicated delinquent, a circumstance not characteristic of foster homes or families composed of blood relatives. In the final analysis, the use is institutional, not intended by the drafters of the ordinance and not within the category of permitted uses.
*296 All of this is not to say that the Department's program is undesirable. Its merits are obvious. Nor is it to say that the Department is subject to the zoning ordinance: only that its proposed use does not fall within its terms.

The Group Home Statutes
N.J.S.A.. 40:55D-66(c) provides:
c. No zoning ordinance shall, by any of its provisions or by any regulation adopted in accordance therewith, discriminate between children who are members of families by reason of their relationship by blood, marriage or adoption, and foster children placed with such families in a dwelling by the Division of Youth and Family Services in the Department of Institutions and Agencies or a duly incorporated child care agency and children placed pursuant to law in single family dwellings known as group homes. As used in this section, the term "group home" means and includes any single family dwelling used in the placement of children pursuant to law recognized as a group home by the Department of Institutions and Agencies in accordance with rules and regulations adopted by the Commissioner of Institutions and Agencies provided, however, that no group home shall contain more than 12 children.
The statute was amended in 1974 to add the references to group homes. The legislative history which appears in the Sponsor's Statement is as follows:
The purpose of this bill is to clarify the status of group homes for children as single family units. Several such group homes have recently been established in New Jersey, and more are contemplated, to house juveniles under the care and custody of the Division of Youth and Family Services and other children who cannot make a satisfactory adjustment in their own homes. As the availability of foster homes is reduced and the need for placement increases, the group homes [sic] becomes a viable means of caring for children. The goal of a group home is similar to the goal of what has been thought of as a foster home  to house troubled children in a home-like setting in a residential neighborhood under the supervision of understanding adults and thus to aid these children to function successfully as members of the community. Placement in a group *297 home, which may house between five and twelve children, can provide more professional services as well as the opportunity for positive peer group interaction, not generally available in a family foster home. Under existing law, a family foster home must be considered a single family unit, although it may house several unrelated children. Group homes, a new concept for New Jersey although successful in other states for some years, are not mentioned in the law. Group homes should be recognized and children in these homes protected in the same way as are children in family foster homes.
The group home language, added to N.J.S.A. 40:55D-66(c) in 1974, was added to N.J.S.A. 30:4C-1 and 26 at the same time. Both statutes deal with dependent and neglected children.
This group home legislation must be considered in connection with the statutory authority of the Department of Corrections. It is directed to:
Develop alternatives to conventional incarceration for those offenders who can be dealt with more effectively in less restrictive, community-based facilities and programs: and
Separate juvenile offenders from the adult offender population and develop programs and services for juvenile offenders which recognize their special needs; * * * N.J.S.A. 30:1B-3A(2)(3).
The Commissioner of Corrections is directed to:
Promote the development of alternatives to conventional incarceration for these offenders who can be dealt with more effectively in less restrictive, community-based facilities;
Provide for the separation of juvenile offenders from the adult offender population and the development of programs and services for juveniles which promote their rehabilitation and recognize their special needs; * * * N.J.S.A. 30:1B-6m, n.
The background of these provisions is found in the following Statement by the Assembly Institutions, Health and Welfare Committee dated May 26, 1976:
* * * Furthermore, the committee felt that separate programs and services for juveniles were necessary and included a statement of intent for separation of juveniles from adults in the new department. Lastly the intent section stated *298 that the environment for offenders should encourage possibilities of rehabilitation and reintegration into the community and minimize possibilities for victimization of offenders within institutions.
* * * * * * * *
There was considerable discussion about the inclusion of juvenile correctional facilities in the new Department of Corrections. Interest groups opposed such inclusion, stressing the need for treating rather than punishing juveniles and keeping juvenile correctional programs in the newly-named Department of Human Services. The committee, however, expressed its confidence in a new department with a commissioner whose single purpose would be to provide correctional services and programs appropriate to the needs of both adults and juveniles, as expressed in the legislative intent section added by amendment.
The Senate Institutions, Health and Welfare Committee, in its Statement dated July 22, 1976, said:
The Senate Committee concurred with amendments made by the Assembly Committee * * *
The Senate Committee also amended the bill in several respects. First it added five new paragraphs to the section of the bill which prescribes the responsibilities of a new Commissioner of Corrections. In addition to responsibilities already set out in the bill, the commissioner would be required to: * * promote alternatives to conventional incarceration for certain offenders * * ensure that juveniles are separated from adult offenders and treated in accordance with their special needs.
It is the State's position that its new program results in the establishment of "group homes" protected by the above statutes from zoning restrictions. Some confusion results from the fact that the Department of Institutions and Agencies is no longer in existence, having been divided into the Department of Human Services and the Department of Corrections. The Department of Institutions and Agencies promulgated regulations which recognize group homes. N.J.A.C. 10:128-1.1 et seq. These regulations relate only to facilities operated by the Department of Youth and Family Services ("DYFS"). They exclude the Department of Corrections from their operation, N.J.A.C. 10:128-3, and that Department has not adopted regulations *299 relating to group homes. This circumstance is fatal to its contentions. It is clear from the statutes that the only group homes exempted from zoning regulation are those recognized through the adoption of regulations.
Aside from this circumstance, it is apparent from a reading of N.J.S.A. 40:55D-66(c) and N.J.S.A. 30:4C-1 and 26 that the Legislature intended to make a distinction between children involved in correctional facilities and those not so involved. The only agency referred to in these statutes is the Division of Youth and Family Services. They must be read in pari materia; they were amended at the same time and announce the same purpose in the same language. Levin v. Bridgewater, 57 N.J. 506, 512 (1971); State v. DiCarlo, 67 N.J. 321, 325 (1975). They make references to DYFS and reflect an intention that the only group homes to be exempt from zoning regulation are ones under the supervision of DYFS.
It is reasonable to suppose that the Legislature intended to draw a line beyond which the zoning exemption would not extend since, otherwise, any group of criminal offenders, regardless of the crime committed, could be established in a community once regulations were adopted by the Department of Corrections defining the group, without concern for zoning. While it is true that the legislative history of N.J.S.A. 40:55D-66(c) refers not only to group homes established by DYFS but also to "other children," it defines those children as ones "who cannot make a satisfactory adjustment in their own homes," a definition which distinguishes them from children who are delinquents. Had the Legislature wished to include juvenile delinquents in its zoning exemption, it could have done so very easily by express language.
The Commissioner of Corrections and his department is expected by the Legislature to make special arrangements for juveniles, in particular ones which separate them from the adult criminal population. That salutary direction should not be expanded *300 to support a conclusion that the Department is expected to establish group homes for such juveniles in communities throughout the State without zoning consideration or control.
It follows from this that a group home established under the new program of the Department of Corrections is not exempt from zoning regulations and that the Legislature, by excluding the Department from its exemption statute, intended that it should heed local zoning legislation.

Immunity
Government departments may or may not be immune from regulation by municipal zoning ordinances. The question is one of legislative intent. Rutgers v. Piluso, supra, 60 N.J. at 152. Each case must be judged upon its unique facts. In Rutgers the Supreme Court set forth five tests to be applied in determining immunity.
First to be considered is the nature and scope of the instrumentality seeking immunity. Here, the Department of Corrections, in the language of Rutgers, is "an instrumentality of the state performing an essential governmental function for the benefit of all the people of the state". Id. at 153. Consequently, it should be concluded that the Legislature did not intend to restrict its functions through local zoning ordinances. The Rutgers court was of the opinion that this was generally true of all state functions and agencies. Id. at 153.
The second consideration is the kind of function or land use involved. Here, the use is purely residential in nature though the operation is institutional. It is a use which is different, though not remotely so, from other uses in the neighborhood.
The third test is the extent of the public interest to be served by the use. It is obvious that this interest is great. It involves no less than the rehabilitation of wayward children before they are lost in the criminal labyrinth. It seems doubtful that our *301 problems of crime can be solved without considerable community participation and responsibility. The program offers all of these prospects.
The fourth concern is the effect that local land use regulations would have on the enterprise concerned. It was testified here that the State is met with opposition in every community in which it attempts to establish a correctional facility. Obviously, then, zoning regulations could prevent entirely the development of correctional programs. However, land use regulations may not be arbitrary. Home Builders League of So. Jersey v. Berlin Tp., 157 N.J. Super. 586, 596 (1978). A reasonable ordinance could control but not prevent the program here proposed; in any event, it may not collide with policy goals established by the State. Garden State Farms, Inc. v. Bay, supra, 77 N.J. at 454.
Finally, the impact upon legitimate local interests must be weighed. Here, it is apparent that the impact may be substantial. State ownership removes a ratable from the tax rolls. The character of a portion of the community will be changed. Delinquents will be introduced into a township which is said to have the most serious juvenile delinquent problem in Burlington County. There will be uncertainty about future uses of the property since the State can provide no guarantees in this direction.
Rutgers found the State University to be immune from zoning regulation. Berger v. State, supra, held that the Department of Institutions and Agencies was immune from zoning with respect to the establishment of a group home for multi-handicapped children. Both of these cases were decided prior to the adoption of the Municipal Land Use Law which became effective on August 1, 1976, and therefore legislative intent must be examined in the light of that enactment. Under N.J.Const. (1947), Art. IV, § 7, par. 11, legislation is to be construed liberally in favor of local authority; consequently, "legislative intent to supercede local powers must clearly be present." Garden State Farms, Inc. v. Bay, supra at 450.
*302 The purposes set forth in the Municipal Land Use Law include the prevention of development of an individual municipality in "conflict with the development and general welfare of neighboring municipalities, the state, the county, and the State as a whole"; the encouragement of "appropriate and efficient expenditure of public funds by the coordination of public development with land use policies," and the encouragement of "coordination of the various public and private procedures and activities shaping land development with a view of lessening costs of such development and * * * the more efficient use of land." N.J.S.A. 40:55D-2. These provisions indicate an intention to balance public and private interests. Municipal capital improvement projects, though involving state funds and agencies, may be subjected to planning board review. N.J.S.A. 40:55D-29-31.
The latest pronouncement on the subject is Garden State v. Bay, supra, an opinion postdating the adoption of our Municipal Land Use Law. That case dealt with the establishment of a private helistop, authorized by the Director of the Division of Aeronautics of the New Jersey Department of Transportation but prohibited by a municipal land use ordinance. The Supreme Court reviewed the history of legislation dealing with helistops and airports, concluding that there was a clear intent to give municipalities authority over the establishment of these aeronautical facilities. At the same time it noted a paramount power in the Director of the Department with respect to such matters. It observed that "in differing but analagous contexts, the State has exercised paramount power with respect to a subject matter or activity yet reserved to local government authority to control facets which particularly involve and impact upon local concerns * * *." Id. at 454. In order to balance these conclusions it held that "while municipalities consistent with the broad statutory purposes of zoning, N.J.S.A. 40:55D-2, may pass ordinances fixing particular land areas for airports or heliports, or even ban them altogether, they must not exercise their zoning authority so as to collide with expressed policy goals *303 of the State legislation * * * or the final decision of the Commissioner." Ibid. The court satisfied these legislative intentions by holding that the Director, while having authority to make the ultimate decision, must give consideration to local zoning ordinances before doing so.
From this analysis the conclusion emerges that there is a qualified immunity from local zoning for activities of the Department of Corrections. Analysis of the Rutgers tests, as applied to the New Lisbon program, reflects a legislative intent favoring the supremacy of the municipal ordinance only with respect to the impact of the proposed program upon legitimate local interests, and, guardedly, with respect to the effect local land use regulation would have on the proposed program. All of the other tests favor an interpretation of the statute as providing immunity. The nature and broad scope of the activities entrusted to the Department of Corrections overwhelms other concerns. It discharges "an essential governmental function for the benefit of all the people of the state," Rutgers, supra, 60 N.J. at 153, and it follows that the Legislature would not intend to have its authority restricted by local zoning ordinances. The provisions of the new Municipal Land Use Law provide mild support for the concept of increased municipal control through zoning, but not enough to change my conclusion.
The Department's immunity is not entire. Its Commissioner may reach an ultimate conclusion in conflict with local legislation, but only after he considers that legislation as well as other municipal concerns. Indeed, the zoning ordinance may control the establishment of a correctional facility so long as it does not "collide with expressed policy goals of the state legislation * * or the final decision of the Commissioner." Garden State, supra, 77 N.J. at 454. The fact that Pemberton's ordinance does not provide for the proposed use does not excuse a failure to consider its requirements. In Garden State Farms the court required the State to weigh the local zoning regulations even though they expressly prohibited the desired use, and directed *304 consideration of a variance application. Id. at 455, 456. Consequently, the township's zoning regulations may be overridden only by the decision of the Commissioner, who must have considered them in reaching that decision. Here, the Commissioner admittedly ignored local zoning interests (including subdivision, site plan and master plan ordinances) in reaching his decision to purchase and use the Goodman home. If that circumstance makes his decision arbitrary, it cannot be sustained.

Arbitrary Action
Restraints upon immune state agencies are set forth in Rutgers v. Piluso:
It is however most important to stress that such immunity in any situation is not completely unbridled. Even where it is found to exist, it must not * * * be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interests. This rule must also apply to the state and its instrumentalities as well as to lesser governmental entities entitled to immunity. For example, it would be arbitrary, if the State proposed to erect an office building in a crowded business district of a city where provision for off-street parking was required, for the state not to make some reasonable provision in that respect. And, at the very least, even if the proposed action of the immune governmental instrumentality does not reach the unreasonable state for any sufficient reason, the instrumentality ought to consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible. [60 N.J. at 153].
The position of the Supreme Court in Rutgers, Berger and Garden State Farms reflects a valid concern over the enormous increase in governmental power which has taken place since our country was founded. That power, unchecked, is our most pressing threat to individual liberty and expression. It is a small thing to require a government agency to consider local desires before those decisions are ground to dust by what isolated officials in high places deem a more important goal.
*305 The essential language of Rutgers was repeated in Berger v. State and Garden State Farms, Inc. v. Bay. The Berger court, after holding the Department of Institutions and Agencies to be immune from local zoning with respect to the establishment of a group home for multi-handicapped children, considered whether it had proceeded arbitrarily. It found that it had not, concluding that the State's negotiations with the mayor and borough attorney, its participation in a public meeting and the fact that the establishment of the State's program had no serious detrimental effect on the area surrounding the property involved, were enough to make the action reasonable. The court did not discuss the problem resulting from any failure to consider the local zoning ordinance, a circumstance which may have resulted from its finding that the portions of the zoning ordinance prohibiting the State's proposed use were invalid.
The question of zoning finally received the direct attention of the Supreme Court in Garden State Farms, Inc. v. Bay, supra, in which it was a dominant theme. There, the Commissioner of Transportation was required to give particular attention to local zoning concerns. The court said:
* * * we perceive that it is entirely appropriate for the Commissioner to pay due attention to the lawful zoning expressions of local governments and not act "* * * in an unreasonable fashion so as to arbitrarily override all important legitimate local interests". Rutgers v. Piluso, 60 N.J. 142, 153 (1972). In a similar context, where the actions of state-level officials were held to be otherwise impervious to local zoning ordinances, we have stated that they "* * * ought to consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible". Id. at 154.
Especially probative of the vital interests of local government is the municipal zoning ordinance itself. Indeed, the Commissioner by regulation already recognizes the importance of such interests by giving controlling weight to local ordinances in the case of applications for public use airports and private landing strips. Clearly he should, at the very least, acknowledge the relevance of the local zoning ordinance with respect to applications for private heliports and helistops. To this we would add as a material consideration that the Commissioner *306 ought to take into account whether an applicant for a private heliport has availed itself of any right to a variance under the local zoning law and whether an application for a variance should be pursued as a helpful procedure for fleshing out the impact of the proposed facility upon neighboring land uses.
These observations are not inconsistent with current thinking with respect to locating helistops and heliports. As the Director of the Division testified at trial, normal administrative procedure is to accommodate the needs and desires of localities in establishing aeronautical facilities; so much so that as a matter of policy the initiative would not ordinarily be taken to place a helistop or heliport within a municipality unless the municipality permitted such a use. Such deference to municipal zoning ordinances expresses the statutory policy to assimilate local land-use decisions, N.J.S.A. 40:55-1.11(c) (currently N.J.S.A. 40-55D-28(b)(4)), tempered by the supervision of the Commissioner. N.J.S.A. 6:1-29. Thus, a failure on the Commissioner's part to weigh conscientiously local interests, to examine carefully whether the proposed aviation facility is compatible with the surrounding land uses and to consult the local ordinances and authorities in making its licensing decision would constitute an abuse of discretion. [77 N.J. at 455; [citations omitted]
Thus, the Garden State Farms court found authority in the master plan article of the Municipal Land Use Law, N.J.S.A. 40:55D-28(b)(4), requiring state deference to municipal zoning ordinances. That portion of the statute deals with the preparation of a master plan providing for transportation facilities. The preceding paragraph of the same statute authorizes "a housing plan element, including but not limited to, residential standards and proposals, for the construction and improvement of housing." Paragraph (6) also authorizes "A community facilities plan element showing the location and type of educational or cultural facilities, historic location and type of educational or cultural facilities, historic sites, libraries, hospitals, firehouses, police stations, and other related facilities, including their relation to the surrounding areas." Those paragraphs require deference to Pemberton's zoning and planning interests on the part of the Commissioner of the Department of Corrections.
*307 Here, the Commissioner gave no consideration whatsoever to the local zoning ordinance. He did not give the municipality any opportunity to acquaint him with zoning problems, did not consider any provisions of the ordinance which affected, or may have affected, his decision. The deadline created by the public sale of the property and the State's dedication to a particular building, required such speedy action that no regulations for its use or the use of group homes generally have been established by the Department of Corrections. This contrasts with the action of DYFS; in dealing with the same problem it adopted very extensive regulations providing public assurance as to its plans and intentions. N.J.A.C. 10:128-1.1 et seq. Consequently, Pemberton Township has no way of knowing the nature of the program except through informal representations made by Department personnel. There is no suggestion that these representations are not made in good faith; all of the witnesses were convincingly to the contrary. Nevertheless, as time passes, personnel changes and experience develops, ideas and programs change. This is particularly true with experimental programs. The risk is enhanced by the failure to commit a program to formal guidelines. Consequently, a municipality affected by such a program is entitled to as much information as possible in order to know the local consequences likely to result.
In Garden State Farms the court noted the policy of the Department of Transportation to defer to local requirements for the establishment of helistops. Consequently, the insistence that the Commissioner in that case consider the local ordinance was in keeping with his Department's policy. Here, Department officials testified to its constant concern about public reaction to the establishment of its facilities, reaction frequently opposed to its undertakings. Consequently, it has been the policy of the Department to test public response to its plans with the understanding that real objections could result in a decision not to *308 proceed. The requirement that the Commissioner here concern himself with local zoning enforces that policy.

Conclusion
The program to be launched by the Department of Corrections will commence an institutional use in the residential zone of a community already entertaining a substantial number of such uses. There appear to be alternative sites available in Pemberton Township to which there would not be objections. None of these alternatives was given serious consideration, so it is not known whether any is suitable. Local legislation providing for group homes in the township was pending at the time of the hearing; if adopted, it is entitled to consideration by the Commissioner.
There has been no review of any of the township's zoning and planning ordinances and no effort made to resolve any problems which may arise under them by reason of the establishment of the proposed use. Justification of a decision by hindsight, at trial level, permitted in Berger but not in Garden State Farms, has obvious limitations. At that point the tendency is to support a fait accompli, risking an absence of real consideration of municipal demands. Exploration of the reasons which support the decision in a trial setting denies the public participation expected and available, for example, in the course of a hearing before a zoning board of adjustment. Here, the Commissioner admits that he did not consider zoning when his decision was made. Can he now be heard to say that such consideration makes no difference when its effect has been explained only in the court room? Since the Department has adopted no regulations concerning its program, it cannot be known with certainty what problems must be faced by the municipality. The circumstances raises questions as to whether the State has faced all of the myriad issues with which its newly evolving program is concerned.
For these reasons, I find the action of the Commissioner to have been arbitrary and therefore unenforceable. He may, of *309 course, reconsider his decision if he first meets the requirements laid down here. It is possible that he will then be of the same mind as he is now and also possible that the reconsidered conclusion will withstand judicial scrutiny. The procedures to be undertaken by him are for his discretion. The advantages of a variance application are obvious, Garden State Farms, Inc. v. Bay, but that approach is not mandatory. The central requirements are that a sufficient opportunity be provided for local citizens to air their concerns, that zoning problems to be caused by the use be developed, that there be a genuine consideration of resolutions, if any are possible, and, if not, a careful balancing of the need for the undertaking against its negative effects upon the community. The ultimate demand is that the final decision be reasonable, not arbitrary. In the event local concerns are to be ignored, valid reasons must be given.
The restraining order is therefore permanent.