(576 P 2d 230)

No. 48,775

Kenneth W. Brown, Don D. Pretzer, David Otto, David Soupene, James L. Rose, Larry Noble, Roy Carter, William E. Butler, Patrick Joseph, Fred Gibbs, John Merriman, Richard A. Nemecheck, Frank O. Nelson, Clark D. Rusco, *Appellees,* v. Kansas Forestry, Fish and Game Commission, *Appellant.*

Opinion filed March 3, 1978.

*Jonathan P. Small,* assistant attorney general, and *Curt T. Schneider,* attorney general, for the appellant.

*Richard H. Seaton,* of Everett, Seaton and Peck, of Manhattan, for the appellees.

Before Spencer, P.J., Foth, C.J., and Swinehart, J.

Foth, C.J.: The issue presented in this appeal is whether, in the absence of any clear legislative direction one way or the other, a state agency must conform its land use to local zoning regulations. It is an issue which has not been squarely answered by the courts of this state.

The agency involved here is the state forestry, fish and game

commission. In 1975 it purchased two lots in the middle of a twenty-three lot subdivision near Manhattan, Kansas, which had been zoned for single family residences. The commission intended to use the land for a public parking lot, complete with toilet facilities, for the convenience of its patrons using a fishing and recreation facility on the adjacent Big Blue River.

The plaintiffs own and reside on fourteen of the twenty-one other lots in the subdivision. They brought this action to enjoin the commission from its proposed use of its land, alleging that such use would violate both Riley county zoning regulations and certain restrictive covenants governing the subdivision. After a hearing, and upon the parties' stipulation that the commission's proposed use would violate the zoning regulations, the trial court temporarily enjoined the use. It further ordered that the injunction would be made permanent unless the commission promptly perfected an appeal or applied for rezoning. Rather than seek rezoning the commission elected to take this appeal.

In this court, as in the court below, the commission argues that it is exempt from local zoning regulations for two reasons. First it says that as an agency of the state itself, performing a governmental function, it is immune from regulation by a mere political subdivision in the absence of a legislative declaration to the contrary. Second, it relies on its possession of the power of eminent domain as indicating a legislative intent that its use of land not be subject to control by local authorities.

A concise review of the terms in which courts have traditionally analyzed conflicts between governmental agencies over land use regulations is found in *City of Temple Terrace v. Hillsborough Ass'n, Etc.,* 322 So. 2d 571 (Fla. App. 1975), affirmed on opinion below, *Hillsborough Ass'n, Etc. v. City of Temple Terrace,* 332 So. 2d 610 (Fla. 1976). The Florida Court of Appeals there noted:

" . . . In deciding this type of case, the courts have used varying tests. One approach utilized by a number of courts is to rule in favor of the superior sovereign. Thus, where immunity from a local zoning ordinance is claimed by an agency occupying a superior position in the governmental hierarchy, it is presumed that immunity was intended in the absence of express statutory language to the contrary. *E.g., Aviation Services, Inc. v. Board of Adjustment,* 1956, 20 N. J. 275, 119 A.2d 761. A second test frequently employed is to determine whether the institutional use proposed for the land is 'governmental' or 'proprietary' in nature. If the political unit is found to be performing a governmental function, it is immune from the conflicting zoning ordinance. *E.g., City of Scottsdale v. Municipal Court,* 1962, 90 Ariz. 393, 368 P.2d 637. On the other hand, when the use is

considered proprietary, the zoning ordinance prevails. *E.g., Taber v. City of Benton Harbor,* 1937, 280 Mich. 522, 274 N. W. 324. Where the power of eminent domain has been granted to the governmental unit seeking immunity from local zoning, some courts have concluded that this conclusively demonstrates the unit's superiority where its proposed use conflicts with zoning regulations. *E.g., Mayor of Savannah v. Collins,* 1954, 211 Ga. 191, 84 S.E.2d 454. Other cases are ·controlled by explicit statutory provisions dealing with the question of whether the operation of a particular governmental unit is subject to local zoning. *E.g., Mogilner v. Metropolitan Plan Commission,* 1957, 236 Ind. 298, 140 N.E.2d 220.

"When the governmental unit which seeks to circumvent a zoning ordinance is an arm of the state, the application of any of the foregoing tests has generally resulted in a judgment permitting the proposed use. This has accounted for statements of hornbook law to the effect that a state agency authorized to carry out a function of the state is not bound by local zoning regulations. 2 Anderson, American Law of Zoning § 9.06 (1968); 8 McQuillin, Municipal Corporations § 25.15 (1965)." (p. 574.)

Additional cases reflecting the traditional views are collected in Anno: Zoning—Governmental Projects, 61 A.L.R.2d 970. Cases dealing specifically with waste disposal facilities may be found in Anno: Government Entities—Zoning Regulations, 59 A.L.R.3d 1244.

There being no "explicit statutory provision" applicable here, the commission relies on the other three common tests: in its first argument it combines the "superior sovereign" with the "governmental-proprietary" test; in its second it asserts the "eminent domain" test. All have been subject to scholarly criticism as too simplistic, avoiding the kind of analysis needed for rational resolution of the complex issues posed by land use problems in a modern, urban-oriented society. See, Comment, "The Applicability of Zoning Ordinances to Governmental Land Use," 39 Tex. L. Rev. 316 (1961); Note, "Municipal Power to Regulate Building Construction and Land Use by Other State Agencies," 49 Minn. L. Rev. 284 (1964); Comment, "The Inapplicability of Municipal Zoning Ordinances to Governmental Land Uses," 19 Syracuse L. Rev. 698 (1968); Note, "Governmental Immunity From Local Zoning Ordinances," 84 Harv. L. Rev. 869 (1971).

Recent judicial pronouncements are increasingly in the same vein. Thus in *State v. Kopp,* 330 S.W.2d 882 (Mo. 1960), the question was whether a city had to comply with county zoning ordinances in building a sewage disposal plant outside the city limits. The court viewed the question as one of legislative intent, "not to be resolved simply by applying the 'governmental vs. proprietary' test." (p. 887.) The court went on to find that the

grant of eminent domain power to the city evinced a legislative intent that it not be subject to county zoning. Just two years later, however, the same court, in *St. Louis County v. City of Manchester,* 360 S.W.2d 638 (Mo. 1962), found that a city's possession of eminent domain power did not grant automatic immunity from the county's zoning power in locating its disposal plant. Rather, the court sought to reconcile the two powers and held that the eminent domain statutes "do not purport to give the city the right to select the exact location in St. Louis County, and the public interest is best served in requiring it to be done in accordance with the zoning laws." (p. 642.) Missouri thus has abandoned as controlling both the governmental-proprietary and the eminent domain tests, looking instead to legislative intent and the public interest.

The Missouri court relied in part on *City of Richmond v. County Board,* 199 Va. 679, 101 S.E.2d 641 (1958), where a statute authorizing the city to establish a jail outside the city limits was held not to authorize a location in violation of the county's zoning regulation. Rather than rely on any automatic test, and specifically rejecting the "governmental-proprietary" test, the Virginia court also sought to reconcile the two enactments and give each full play. It found no conflict, saying:

> "Nor do we find anything in the legislative history of [the zoning enabling act] which supports the claim of the city that this section exempts it from compliance with the zoning ordinance of the county. The ordinance of the county does not take away, impair, or amend the right of the city to establish its jail beyond the limits of the city. The city may establish its jail or jail farm in the district of the county within which such institutions are permissible, or it may follow the procedure prescribed in the ordinance of the county, and request an amendment of the ordinance to permit the use of its land for the desired purpose. From arbitrary or unreasonable action by zoning officers of the county, it may apply for judicial review." (pp. 686-87.)

Pennsylvania has employed a similar analysis. In *Wilkinsburg-Penn JT. W. A. v. Churchill B.,* 417 Pa. 93, 207 A.2d 905 (1965), a municipal water authority sought to build a water tower in violation of borough zoning restrictions. When the borough refused a variance the authority brought suit to enjoin the borough from interfering with the proposed structure. The court viewed the question as one of statutory construction; the fact that the authority was given the power to determine its services "exclusively" did not make it immune from the zoning power of

the borough. "The initial service decisions remain with the Authority, but they must be made within the framework of other applicable laws, unless the Legislature directs otherwise." (p. 101.) The two grants of authority—to build and to zone—could be reconciled. Should there be an improper exercise of the zoning power as to the authority's land use, the court said, it could be challenged in the same manner as other zoning decisions.

Later, in *City of Pittsburgh v. Commonwealth,* 468 Pa. 174, 360 A.2d 607 (1976), the same court decided a zoning dispute between the state's bureau of corrections and a city over the location of a pre-release center for women convicts. It commenced its analysis by observing:

"Resolving the conflict simply by saying that the 'state' agency must prevail because it is exercising the power of the sovereign overlooks that the zoning power the city seeks to exercise is also a sovereign power. Such a resolution ignores the interests the state seeks to promote by legislative grants of powers to municipalities. Interests such as those fostered by comprehensive land use planning statutes are too important not to be recognized as involving exercises of state power." (p. 180.)

The court resolved the question by again reconciling the grants of authority. The city's zoning, which would permit pre-release centers in other parts of the city, was held not to be arbitrary. Finding that "suitable alternatives exist to accommodate both the community's interest in maintaining the integrity of low-density, residential zoning and the needs of the Bureau" (p. 187), the court held that the state agency's use was subject to the city's zoning ordinance.

Pennsylvania's way in this area was indicated by the leading case in the new wave of intergovernmental zoning decisions, *Rutgers v. Piluso,* 60 N. J. 142, 286 A.2d 697 (1972). There the question was whether Rutgers, the state university, could build student housing units in excess of the maximum number permitted by a township zoning ordinance. The court prefaced its analysis by observing:

"The question of what governmental units or instrumentalities are immune from municipal land use regulations, and to what extent, is not one properly susceptible of absolute or ritualistic answer. Courts have, however, frequently resolved such conflicts in perhaps too simplistic terms and by the use of labels rather than through reasoned adjudication of the critical question of which governmental interest should prevail in the particular relationship or factual situation. . . ." (p. 150.)

After recognizing the three common tests (asserted by the commission here) and reviewing its own prior decisions, the court formulated its own test:

"The rationale which runs through our cases and which we are convinced should furnish the true test of immunity in the first instance, albeit a somewhat nebulous one, is the legislative intent in this regard with respect to the particular agency or function involved. That intent, rarely specifically expressed, is to be divined from a consideration of many factors, with a value judgment reached on an overall evaluation. All possible factors cannot be abstractly catalogued. The most obvious and common ones include [1] the nature and scope of the instrumentality seeking immunity, [2] the kind of function or land use involved, [3] the extent of the public interest to be served thereby, [4] the effect local land use regulation would have upon the enterprise concerned and [5] the impact upon legitimate local interests. . . . In some instances one factor will be more influential than another or may be so significant as to completely overshadow all others. No one, such as the granting or withholding of the power of eminent domain, is to be thought of as ritualistically required or controlling. And there will undoubtedly be cases, as there have been in the past, where the broader public interest is so important that immunity must be granted even though the local interests may be great. The point is that there is no precise formula or set of criteria which will determine every case mechanically and automatically." (pp. 152-53. Numbers inserted.)

The court went on to find that the state university performed an essential governmental function for the benefit of all the people of the state, and that the legislature would not intend its growth to be subject to restriction or control by local land use regulation. After observing that the same reasoning would generally be true of all state functions and agencies, the court added the following caveat:

"It is, however, most important to stress that such immunity in any situation is not completely unbridled. Even where it is found to exist, it must not, as this court said in *Washington Township v. Village of Ridgewood, supra* (26 N. J. at 584-586, 141 A.2d 308), be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interests. This rule must apply to the state and its instrumentalities as well as to lesser governmental entities entitled to immunity. For example, it would be arbitrary, if the state proposed to erect an office building in the crowded business district of a city where provision for off-street parking was required, for the state not to make some reasonable provision in that respect. And, at the very least, even if the proposed action of the immune governmental instrumentality does not reach the unreasonable stage for any sufficient reason, the instrumentality ought to consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible. . . ." (pp. 153-54.)

The test applied in *Rutgers* has come to be known as the

"balancing of interests" test. In *Kunimoto v. Kawakami,* 56 Haw. 582, 545 P.2d 684 (1976), the state university of Hawaii was permitted to condemn land for a use which would violate Honolulu's zoning ordinances. The finding of immunity was based on the overriding statewide concern for higher education expressed in the Hawaii constitution and the university's enabling legislation. The court, however, expressly reserved the question of whether the "balancing of interest" test expounded in *Rutgers* would apply to other state projects.

In another state university case, *City of Newark v. University of Delaware,* 304 A.2d 347 (Del. Ch. 1973), the court reached the same result—*i.e.,* the university's immunity—by expressly following the *Rutgers* rationale. A legislative intent that the university be immune from local zoning was inferred from the vital role it plays in the state's public mission, although such immunity would not prevail if the university's action were shown to be unreasonable or arbitrary in a given instance.

Minnesota adopted a "balancing of interests" test in *Town of Oronoco v. City of Rochester,* 293 Minn. 468, 197 N.W.2d 426 (1972), at about the same time as and apparently quite independently of the *Rutgers* decision, which was not cited. In that case the city's proposed sanitary landfill would violate a township zoning ordinance. The court recognized that under the "general rule" the city would be immune because it possessed eminent domain powers and would be exercising a governmental function. It declined to follow the general rule, saying:

". . . However, the trend is to limit such freedom from regulation, a trend which we believe is well within the dictates of the public interest, principally because the pungent realities of urban sprawl and overpopulation have accentuated the need for land-use planning and control that serves as foundation for the exercise of police power in the area of zoning. Consequently, in order to support the principle of enlightened land-use control, we decline to adopt in Minnesota the general rule of governmental exemption from zoning regulation.

"The exigencies of the present matter, however, illustrate the core of wisdom in that general rule and the danger in too readily assuming enlightenment where none in fact may exist in the implementation of a particular local zoning policy. Therefore, we adopt a balancing-of-public-interests test for the resolution of conflicts which arise between the exercise by governmental agencies of their police power and their right of eminent domain. This is preferable to adherence to a less flexible 'general rule' based simply on the form of the opposing parties rather than the substance of their conflict." (p. 471. Footnotes omitted.)

Balancing the city's urgent need to replace its present disposal

system against the marginal impact on the proposed area for the new facility, the court found immunity should prevail under the facts of that case.

The Florida Court of Appeals, in *City of Temple Terrance v. Hillsborough Ass'n, Etc.,* supra, after describing the traditional tests in the language quoted above, rejected them one by one. It adopted in their stead the *Rutgers* "balancing of interests" test, justifying its decision by saying:

"The old tests were adopted at a time when state government was much smaller. The myriad of agencies now conducting the functions of the state have necessarily resulted in a diminution of centralized control. The decision of a person administering an outlying function of a state agency with respect to the site where this function should be performed is not necessarily any better than the decision of the local authorities on the subject of land use. The adoption of the balancing of interests test will compel governmental agencies to make more responsible land-use decisions by forcing them to consider the feasibility of other sites for the facility as well as alternative methods of making the use of proposed site less detrimental to the local zoning scheme.

"Our burgeoning population and the rapidly diminishing available land make it all the more important that the use of land be intelligently controlled. This can only be done by a cooperative effort between interested parties who approach their differences with an open mind and with respect for the objectives of the other. When the state legislature is silent on the subject, the governmental unit seeking to use land contrary to applicable zoning regulations should have the burden of proving that the public interests favoring the proposed use outweigh those mitigating against a use not sanctioned by the zoning regulations of the host government." (322 So.2d at 578-79.)

In adopting the Court of Appeals opinion in that case as its own the Florida Supreme Court noted a further policy consideration:

"An ancillary benefit in resolving intergovernmental disputes results from our adoption of the City's view. By requiring state agencies to seek local approval for non-conforming uses, an administrative solution is always present in the form of zoning appeals. In contrast, if the state were not required to seek local approval, the city would always be forced to litigate its disagreement, as happened here. It serves the public's benefit to resolve these controversies in a way which does not mandate the most expensive and least expeditious way of settling intergovernmental disputes." (*Hillsborough Ass'n, Etc. v. City of Temple Terrace,* supra at 612, n. 3.)

Finally, among foreign cases, we note *Matter of Suntide Inn Motel,* 563 P.2d 125 (Okla. 1977), cited to us by the commission at oral argument. It does not support the kind of automatic immunity urged on us by the commission. The issue in that case was whether the state department of corrections was required to have

city planning commission approval for the location of a community treatment center. Three justices in the majority found that such approval was not necessary, basically because the state, as the superior sovereign, was not bound by local regulation in the absence of an express legislative declaration. Four justices dissented, urging that the *Rutgers* balancing test should be adopted, and that under such a test the state agency should seek local approval. The dissenters observed:

"There were, at last official count, 235 state boards, agencies and commissions. It is unrealistic to assume that all 'state' demands upon municipal land which these agencies could potentially make, would be for equally important public purposes or that their site selections would always be reasonable.

"Each intergovernmental conflict over land-use will present novel questions regarding the relative interests of the governmental units involved, the reasonableness of the site location, the availability of alternative locations and the adverse consequences which will be suffered by local interests and must be resolved on a case by case basis." (p. 132. Footnote omitted.)

Two justices were in between. They concurred in the finding of immunity, but only because they thought the result of balancing tipped in favor of the state agency. As to the test to be applied, the writing concurring justice noted:

" . . . I believe the dissent correctly reflects a more enlightened view of the concept of sovereign immunity. To hold a state is never subject to local zoning restrictions is to emasculate in perpetuum, the very power the state has granted to municipalities, to zone and regulate its orderly growth." (p. 129.)

Thus of the nine justices participating, six rejected any such automatic test as the "superior sovereign" test, and applied instead a balancing of interests test.

In Kansas, as we noted at the outset, there have been no decisions directly in point. Three, however, deserve mention. In *Puhr v. Kansas City,* 142 Kan. 704, 51 P.2d 911 (1935), the board of public utilities erected a water tower in an area zoned for residential use. Neighbors sued for damages, based in part on a violation of the zoning ordinance. The court held that demurrers to the petitions should have been sustained. On the zoning aspect of the case the court noted that the board's enabling act gave it plenary power to determine where its facilities should be located, and further, that the city was required to enact all ordinances deemed necessary by the board of public utilities to protect its water and electric plants. The case, as we see it, is purely one of

statutory construction in which it was found that the applicable statutes gave power to the board, not the city.

*Nelson v. City of Emporia,* 185 Kan. 161, 341 P.2d 977 (1959), was a suit by landowners to enjoin the city from maintaining a dump in an area alleged to have been zoned by the county. The trial court found and the Supreme Court agreed that the dump site was not *in fact* within the area zoned by the county. Hence the injunction was properly denied, and the court did not reach or discuss what the situation might have been if county zoning had purported to cover the city's dump. From the court's discussion of the city's justifiable reliance on a zoning map the underlying assumption appears to have been that the city would have been required to comply if its dump had been located in a zoned area.

Most recently the court decided *Concerned Citizens, United, Inc. v. Kansas Power & Light Co.,* 215 Kan. 218, 523 P.2d 755 (1974). That was a suit by neighboring landowners to enjoin the condemnation of land for a power facility because, among other things, the utility had not obtained county rezoning of the land from agricultural to the proposed use. (For the purpose of our analysis the utility, clothed with the delegated power of eminent domain, stands in the same shoes as a state agency.) The court concluded, from an examination of the eminent domain statutes, that rezoning was not a condition precedent to condemnation; on the zoning question that is all that was decided. The court based its conclusion in part on the fact that the utility was required to be the owner of the land *before* it could apply for rezoning, and obviously wouldn't *need* to condemn if it were already the owner. Hence condemnation had to come first, and rezoning second.

In that case it was not suggested by the parties or the court that the mere act of condemnation would obviate the need to rezone, *i.e.,* that the power of eminent domain carried with it immunity from zoning. The Attorney General, as *amicus curiae,* brought the court's attention pending legislative land use studies and their potential impact on zoning. He also pointed out the potential conflict between the delegated legislative powers of eminent domain and zoning, without suggesting that the former would automatically control the other. Rather, a legislative solution of the conflict was deemed necessary. The assumption throughout was that rezoning would be required, subject to the usual judicial review for reasonableness. (See discussion at page 233.) The court's several pages on the zoning question were all devoted to

*when* the rezoning had to occur, not *whether,* and were based on the express assumption "that there has to be some determination on the zoning question, and no argument has been made that the determination is unnecessary . . . ." (p. 232.)

In our own analysis we start with the premise that the legislature has not spoken directly on the subject, any more than has our Supreme Court. Under K.S.A. 19-2901, counties are given the power to zone "for the purpose of promoting the public health, safety, morals, comfort, general welfare and conserving the values of property throughout that portion of any county zoned under the terms of this act . . . ." The county zoning board, under K.S.A. 19-2906, has "power to determine, restrict and regulate the area within which trade, industries and recreations may be conducted . . . ." On the other hand, under K.S.A. 32-214, the commission is authorized to acquire land for public forestry, recreational grounds and/or game preserves and "to provide for keeping, maintaining and improving such public forestry, recreational grounds, fish and game preserves; to establish such public forestry, recreational grounds, fish and game preserves at such place or places within this state as shall, in the judgment of the commission, be most suitable to carry out the intents and purposes of this act . . . ." There is nothing in the statutes which says the commission is subject to local zoning, nor is there anything which grants it immunity.

We therefore regard the question as open in this state. Given the choice, we think this case aptly illustrates why the balancing of interests test better promotes the public's interest than any of the traditional mechanical tests.

The overall mission being carried out by the commission in this case is the furnishing of recreational facilities for all the people of the state, or at least those who desire to fish in the Big Blue River. This is a public purpose. *Ottawa Hunting Ass'n v. State,* 178 Kan. 460, 289 P.2d 754 (1955). Obviously the commission must be, and is, vested with wide discretionary authority in locating its facilities for such a purpose. The county, on the other hand, has an obligation to make land use decisions within its jurisdiction which take into account both local concerns and the broader public good. It is apparent that either body may act in an arbitrary and unreasonable manner, favoring its own constituency at the expense of the other. The real questions are where the decision-

making authority should be lodged, and if a claim of arbitrariness is to be made who should have the presumption of reasonableness and who the burden of proof.

Dealing with the specifics of this case, we are not talking about establishing a public hunting or fishing facility in an area zoned for agriculture. The merits of such a case appear clear, at least on the surface. Here we are dealing with an all-night parking lot with toilet facilities in the middle of a residential subdivision. The commission anticipates that the recreational facility will be used at a rate of 10,000 man days per year. At least some of those users will employ the proposed parking lot. The merits of this proposal are not nearly so clear. If the facts were fully developed at an evidentiary hearing the location of this particular facility in this particular location might prove to be an arbitrary decision of the commission, unnecessarily impinging on the legitimate expectations of the neighboring landowners and upsetting a carefully conceived local land use plan. On the other hand, it might turn out to be a wholly necessary and beneficial use far outweighing any local concern, for which accommodation should be made by any reasonable zoning body.

If we look at the factors suggested as relevant by the *Rutgers* court we find: (1) The instrumentality seeking immunity is a state agency, and its judgment is entitled to considerable deference. (2) The general function being performed—promoting recreation—is one of recognized public utility but hardly on a level of importance with public education. The specific use, providing parking space near but not in a recreation area, is of a more marginal public interest. (3) While there is public interest in the proposed use in that some people will find this parking lot more convenient than other available lots, the segment of the population affected is relatively small. (4) Regulation, if rezoning is refused, would have the effect of requiring the parking lot to be located in some area other than a residential subdivision. Such a move might make the lot less convenient, but would probably not substantially impair the usefulness of the recreation area. (5) The proposed use would, prima facie at least, have a substantial adverse impact on the surrounding householders and on the existing land use plan.

As noted above, these factors were not weighed on the basis of evidence either by a zoning body or by the court below, and our

*observations are based on a skimpy record and our own general knowledge.* The commission simply asserted its immunity, without attempting to justify the reasonableness of its decision, while the court looked no further than the admitted violation of the zoning regulation.

It seems to us that, on balance, the initial decision on reasonableness in this case can be made more expeditiously and with greater discernment by the local zoning authority—here the county. That being so, we infer a legislative intent that the responsibility should be imposed on that body. If rezoning is arbitrarily denied, that decision can be reviewed by the courts at the commission's behest through normal channels. If, on the other hand, we were to hold that the commission's status as superior sovereign immunizes it from the normal zoning processes as it urges, then the burden of going forward with a lawsuit would fall on either the county or the affected landowners. In such a suit they would be required to show arbitrariness on the part of the commission. While it is true the landowners would have much the same burden if dissatisfied by an order *granting* rezoning, that would be because two administrative agencies at different levels have concurred in finding the proposed use appropriate. The zoning route strikes us as cheaper and faster, and it puts the local land use decision in local hands where, in this case, it belongs.

In this case the district court ordered the commission to seek rezoning. It can still do so. In our opinion that is the proper course for it to take, and the trial court properly so ordered.

Affirmed.