No. 50,979

STATE OF KANSAS, *ex rel.* CURT T. SCHNEIDER, ATTORNEY GENERAL, *Appellant,* v. CITY OF KANSAS CITY, KANSAS, *Appellee.*

(612 P.2d 578)

Opinion filed June 14, 1980.

*Michael J. Davis,* special assistant attorney general, argued the cause and *Robert T. Stephan,* attorney general, was with him on the brief for appellant.

*Annette Eslick,* assistant city attorney, argued the cause and *Robert J. Watson,* city attorney, was with her on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: This appeal is from an order of the district court entered in a quo warranto action filed by the State of Kansas, on behalf of the Board of Regents, seeking a determination by what authority, if any, the City of Kansas City, Kansas, sought to require the Board of Regents to obtain a building permit and follow Kansas City building codes in the construction of a new facility at the University of Kansas Medical Center. The Board also sought equitable relief by way of a restraining order to prevent the City from enforcing its building codes. The trial court held that the Board was required to obtain a building permit and comply with the local building codes. This appeal by the Board of Regents followed. The trial court also held that as the construction was nearly complete, its ruling would only apply prospectively to future construction. The City has filed a cross-appeal from that ruling of the court.

The action was heard by the trial court upon an agreed statement of facts. In 1975, the University of Kansas embarked upon a program to build a radiation therapy facility on the campus of the Kansas University Medical Center located within the city limits of Kansas City. The proposed construction and equipment to be utilized therein would cost in excess of $3,000,000.00. Two

million dollars were appropriated by the Kansas legislature and approximately one million more was to be received through a grant from the federal government. The proposed radiation treatment facility would be utilized in the treatment of private patients who will pay for the services and as a part of the educational system of the Kansas University School of Medicine. In December, 1977, after funding had been assured, bids solicited and construction contracts·let, the chief building inspector of Kansas City advised the general contractor that a building permit and various other city permits would be required before construction could commence. In order to obtain a building permit the plans and specifications must be approved by the City, and the construction must comply with the building, plumbing, electrical and mechanical codes adopted by the City. The proposed facility, as is true with the entire Medical Center, would be dependent upon the City's utilities for water and electricity, would tie into the City's sanitary and storm sewer systems and would rely upon the City for fire protection. The Board of Regents declined to obtain the required permits and filed this action on December 13, 1977, seeking a temporary restraining order and a determination of whether the requirements for a building permit and compliance with the City's building codes are valid. An ex parte restraining order was issued against the City on the same day. No attempt was made by the City to set aside the restraining order; construction of the radiation therapy facility has been completed and it is in operation at the Medical Center. Following the filing of briefs and various delays which occurred for one reason or another, the matter finally came to trial on February 16, 1979, and the court, on February 27, 1979, issued its memorandum decision in favor of the City.

At the outset we deem it advisable to address a procedural issue raised by the City in its cross-appeal. It is the City's contention that the district court erred in not finding that the case should have been filed by the Board of Regents rather than by the State of Kansas on the relation of the Attorney General. It is argued that the real party in interest is not named and the action is improper, having been brought in the name of the State of Kansas.

K.S.A. 60-217(a) provides in pertinent part:

"Every action shall be prosecuted in the name of the real party in interest . . . and when a statute so provides, an action brought for the use or benefit of another shall be brought in the name of the state of Kansas."

K.S.A. 76-713 provides in part:

"The board of regents may sue in its own name or in the name of any state educational institution, or may authorize suit to be brought by the chief executive officer of any state educational institution in the name of such state educational institution. . . . The attorney general, or an attorney designated by the attorney general, shall represent the board of regents and any state educational institution in all litigation."

There being no statute authorizing an action by the Board of Regents to be brought in the name of the State of Kansas, it is the City's position there is no authority for the action to be brought by the State of Kansas. The City relies upon *Torkelson v. Bank of Horton,* 208 Kan. 267, 491 P.2d 954 (1971), wherein this court stated:

"One standard frequently applied is that the real party in interest is the one entitled to the fruits of the action, and the phrase 'real party in interest' is grammatically quite capable of that meaning." 208 Kan. at 270.

In *Torkelson* we also stated:

"The requirement that an action be brought by the real party in interest has as one of its principal purposes the protection of the defendant from being repeatedly harassed by a multiplicity of suits for the same cause of action so that if a judgment be obtained it is a full, final and conclusive adjudication of the rights in controversy that may be pleaded in bar to any further suit instituted by any other party." p. 270.

It is true, and the statutes so contemplate, that in actions involving the Board of Regents it is usually named as such or the individual members are made parties in their collective capacity as the Board of Regents. See, *e.g., Carroll v. Kittle,* 203 Kan. 841, 457 P.2d 21 (1969); *McCoy v. Board of Regents,* 196 Kan. 506, 413 P.2d 73 (1966); *Murray v. State Board of Regents,* 194 Kan. 686, 401 P.2d 898 (1965); *The State, ex rel., v. Regents of the University,* 55 Kan. 389, 40 Pac. 656 (1895). The Board of Regents is a governmental agency created by the legislature at the specific direction of the Kansas Constitution, article 6, section 2(b). As such it is bound by any decision brought on its behalf in the name of the State of Kansas, and there is no danger of harassment of or the filing of a multiplicity of suits against the defendant. In addition, the action was brought by the attorney general who is the person designated by K.S.A. 76-713 to represent the Board of Regents in all litigation. Considering the purpose of the real party in interest statute, the trial court did not commit error in refusing to dismiss the action for failure of it to be filed in the name of the "Board of Regents," the name of the institution involved, or the

chief executive officer thereof. The procedural point raised by the City in its cross-appeal is without merit.

We now turn to the central issue before the court. Can the City of Kansas City require the Board of Regents to obtain a building permit and conform to its building codes for construction at the University of Kansas Medical Center? The State makes several arguments in support of its position that the construction should be free of any requirements to obtain a building permit. Among them are: (1) the Board of Regents as an agency of the state is a superior sovereign to the city and not subject to local regulation; (2) school construction is subject to a pervasive state system of planning and construction which precludes local interferences therewith; (3) that an agency of the state, when engaged in a governmental function as opposed to a proprietary one, is immune from local regulation; (4) the operation of and construction at the Medical Center is one of statewide interest as opposed to local interest and therefore does not concern local affairs and government; and (5) if local regulations may be applicable in some cases, then each individual case should be judged upon its own merits by a balancing test, and any such test would weigh heavily in favor of the State and against the City in this particular instance. The balancing test doctrine is one that has been adopted in several states in land use or zoning cases and was recently adopted by the Kansas Court of Appeals in a zoning case. *Brown v. Kansas Forestry, Fish and Game Commission,* 2 Kan. App. 2d 102, 576 P.2d 230 (1978).

The City, on the other hand, in support of its position contends: (1) the Board of Regents is not a superior sovereign as both are created by constitutional provisions and that the home rule amendment (article 12, section 5) of the Kansas Constitution grants greater sovereignty to the City; (2) the home rule amendment grants authority to the City to require compliance with its building permit and code ordinances; (3) the proposed construction is a matter of local affairs rather than one of statewide concern; (4) that the Board of Regents by its use of utility, sewer and fire services of the City has consented to regulation by the City; (5) that the State does not have available manpower to insure compliance with its own building codes; and (6) that if a balancing test such as that adopted in *Brown* is applied, it weighs heavily in favor of the City.

While a lengthy dissertation on all the various theories of the parties might provide the substance for an extensive law review article, time does not permit us to indulge ourselves in such an endeavor and the decision hereafter reached does not require it. The principal argument by the City in support of its position is that under its home rule powers granted by the Kansas Constitution, it can enforce its building codes upon state agencies, including the Board of Regents.

Article 12, section 5, of the Kansas Constitution provides in part:

"(b) Cities are hereby empowered to determine their local affairs and government . . . . Cities shall exercise such determination by ordinance passed by the governing body . . . subject *only* to enactments of the legislature of statewide concern applicable uniformly to all cities, [and] to other enactments of the legislature applicable uniformly to all cities . . . .

. . . .

"(d) Powers and authority granted cities pursuant to this section shall be liberally construed for the purpose of giving to cities the largest measure of self-government." (Emphasis supplied.)

Before the home rule amendment became effective in 1961, the state legislature possessed all legislative power with respect to municipal corporations except as its exercise was prohibited by the federal and state constitutions. Therefore, the power which the Kansas legislature exercised over the cities was plenary. The legislature granted a certain amount of autonomy to the city governments and the system worked well for years. As the cities grew, however, new needs for city regulation of various activities became necessary and, increasingly, assistance from the legislature was sought. As a result, the legislature was spending a great deal of time dealing with requests from various city officials for legislation that would enable various city governments to regulate a seemingly endless variety of local problems. The amendment was intended to do away with the need for special legislation by eliminating municipal reliance upon enabling acts. "Home rule recognizes the desirability of local initiative in solving local problems created by the proliferation of municipal services." Clark, *State Control of Local Government in Kansas: Special Legislation and Home Rule,* 20 Kan. L. Rev. 631, 654 (1972). For a comprehensive discussion and analysis of the application of the home rule amendment see *Claflin v. Walsh,* 212 Kan. 1, 509 P.2d 1130 (1973).

There is no question that cities in Kansas may pass ordinances setting minimum standards for construction projects, including the adoption of building, mechanical, plumbing, electrical and similar codes. The State, on the other hand, has adopted comprehensive building codes of its own that are mandatory in the construction of all school buildings and, apparently, sometimes conflict with the codes adopted by Kansas City. Do such statutes preclude local municipalities from enforcing local building codes which are or may be in conflict therewith? We think so.

In 1972, the state legislature adopted a comprehensive fire safety and prevention act which prescribes minimum standards for school construction. K.S.A. 31-132 *et seq.*

K.S.A. 31-144(*a*) provides:

"(*a*) As used in this act, 'school building' means any building or structure operated or used for any purpose by, or located upon the land of, any school district, community junior college district, area vocational-technical school, institution under the state board of regents or any private or nonpublic school, college or university, whether or not operated for profit."

### K.S.A. 31-150, prior to amendment in 1978, provided:

"(*a*) The construction of all school buildings shall comply with the requirements of the 1970 edition of the uniform building code, volumes I and II of the international conference of building officials. All electric wiring shall conform to requirements of the 1971 issue of the national electric code of the national fire protection association. Minimum plumbing requirements shall meet the 1970 edition of the uniform plumbing code issued by the international conference of building officials. The construction of school buildings shall include reasonable provision for making buildings and facilities accessible to, and usable by, the physically handicapped, as approved by the state architect. No contract shall be let for the erection of any school building, and it shall be illegal to pay out any public funds for the erection of a school building until the plans for such building shall have been submitted to the state architect and approved as to all the requirements of this section."

In 1978 and 1979, the statute was amended to bring it in line with recently updated codes together with additional requirements, including a mechanical code.

K.S.A. 1979 Supp. 31-150 provides in part:

"(*a*) Except as otherwise provided in subsection (*b*), the construction of school buildings shall comply with the requirements of the 1976 edition of the uniform building code, volume I, and the 1976 edition of the uniform mechanical code, of the international conference of building officials. All electric wiring shall conform to requirements of the 1975 issue of the national electric code of the national fire

protection association. Minimum plumbing requirements shall meet the 1976 edition of the uniform plumbing code issued by the international conference of building officials."

K.S.A. 1979 Supp. 31-150a, originally adopted in 1974, makes it a class B misdemeanor for any violation of any provision of the act. We are advised that Kansas City has a similar penal ordinance mandating compliance with its local building codes. Therefore, if the Board of Regents is subject to local building codes which are in conflict with state building codes, then it is subject to city criminal penalties for following the state code or to state criminal penalties for following the city code. Such a situation would be intolerable.

Art. 6, § 2(b) of the Kansas Constitution provides:

"(b) The legislature shall provide for a state board of regents and for its control and supervision of public institutions of higher education. Public institutions of higher education shall include universities and colleges granting baccalaureate or postbaccalaureate degrees and such other institutions and educational interests as may be provided by law. The state board of regents shall perform such other duties as may be prescribed by law."

Thus, we are faced with the question whether the home rule amendment, art. 12, § 5, authorizes Kansas City to enforce its building permit and code ordinances upon the Board of Regents who derive their authority through legislative action mandated by art. 6, § 2(b). At the outset it must be noted that the fire safety and prevention enactment of 1972 is not uniformly applicable to all cities. K.S.A. 31-144(*b*) makes a distinction between first and second class cities as opposed to all other cities when it comes to inspection of school buildings. Such a provision in one section of the overall enactment requires a determination under our holding in *City of Junction City v. Griffin,* 227 Kan. 332, 607 P.2d 459 (1980), that the act is not uniformly applicable to all cities.

While there have been numerous cases decided by our appellate courts since the passage of the home rule amendment, there are few that have dealt with the problems which arise when a municipality finds itself in conflict with the State or one of its agencies. See *State, ex rel., v. City of Overland Park,* 215 Kan. 700, 527 P.2d 1340 (1974). Most of our decisions under the home rule amendment have involved the resolution of conflicts between local ordinances and state statutes as they affect third parties, usually individual members of the public caught up in the apparent conflict. How then do we resolve a conflict between

Kansas City and the Board of Regents when the local ordinance conflicts with affirmative duties and requirements placed upon the Board of Regents by state statutes?

In the construction of state buildings, the area of school construction appears to be the only one in which the legislature has mandated statewide compliance with specific building codes. The adoption by the state legislature of comprehensive building codes would indicate that the legislature considers the construction of schools to be one of statewide importance as opposed to the local affairs of a municipality in seeking to control construction within its city limits. Insofar as institutions of higher learning under the control of the Board of Regents are concerned, we agree. It has been stipulated by the parties that the function of the radiation therapy facility is both as a hospital and a school. However, it must be conceded that the primary purpose of the Kansas University Medical Center, and all of its components, is to provide medical schooling and training to students. However, by reason of its nature as a functioning hospital the Center is not only subject to state construction codes applicable to school buildings but also to both state and federal statutes and regulations applicable to hospitals. There can be no doubt that continued expansion and construction of facilities at the Medical Center are of concern and interest to the governing officials of Kansas City and that is as it should be. The City is entitled to and should be concerned with the activities at the Medical Center. Utilities, fire protection and sewer services are some of the city services and functions affected by the existence of the Medical Center. As such, the construction is one of local concern but we think not one which is limited to local affairs of the City as contemplated by the home rule amendment. The Medical Center furnishes education and hospital services to citizens from all areas of the State of Kansas as well as from without the state and, along with all other institutions of higher learning, is under the control of the Board of Regents. The activities of the Medical Center are statewide in character and while it exerts a great impact on Kansas City, its functions are not of strictly local concern. Due to the statutes requiring statewide uniformity in the application of the various building codes to construction projects at the various institutions of higher learning under the control of the Board of Regents, such construction does not fall within the purview of

local affairs. It would be impossible to draw a line delineating between local affairs and those which encompass an expanded or statewide application which would be applicable to all situations which might arise. As stated by one prominent author: "No ordinance deals with an *exclusively local matter* and no statute regulates a matter of *exclusively state-wide concern.* Instead, the interests of the municipality and the state are nearly always *concurrent.*" Clark, *State Control of Local Government in Kansas: Special Legislation and Home Rule,* 20 Kan. L. Rev. 631, 662 (1972). We also recognize that the same author does not recommend the approach and conclusion we reach today. Our decision, however, is limited to the parties and factual situation before us.

Similar conflicts have been before the courts of several states and generally have been resolved favorably to the board of regents or other state educational authority. In *Board of Regents of Universities, etc. v. City of Tempe,* 88 Ariz. 299, 356 P.2d 399 (1960), the City of Tempe attempted to impose its building codes and regulations on proposed construction at Arizona State University located within the city limits of Tempe. After setting forth the controlling constitutional and statutory provisions, the court states:

"We think it clear from the foregoing Constitutional and statutory provisions that the Board of Regents and the City of Tempe each has the power to regulate the construction and maintenance of buildings, within the limits of its authority. We are thus not faced with the situation where only the City, and not the Board of Regents or University, may validly prescribe building ordinances or regulations.

. . . .

"The problem remains to resolve the conflict presented by the Board's and the City's assertions of apparently overlapping powers over university construction. It is not disputed that the ultimate power to resolve this controversy rests in the Legislature which concededly may assign exclusive jurisdiction to the Board or to the City. Nor does either party urge that the Legislature has answered this problem expressly. Both rely on the Constitution generally, the intention of the Legislature as gleaned from the applicable statutes, and on the case law.

"The Board of Regents contends that it is an agency of the State and is thereby immune from regulation by a municipal corporation. The City argues that the Board is a corporate instrumentality of the State, but is not itself the State, and has not been exempted from operation of the broad police powers delegated by the State to the City."

. . . .

"The Board of Regents is vested by our Constitution with the 'general conduct and supervision' of the State University (Article XI, Sections 1, 2, 5). By statute the Board has 'jurisdiction and control over the university' and may '[e]nact ordinances for the government of the institutions under its jurisdiction' (A.R.S.

§§ 15-724, 15-725). It has also been authorized to undertake specific construction projects at the universities and college (e.g.: Laws 1959, Chapters 114, 115, 116; Laws 1952, Chapters 139, 140; Laws 1949, Chapter 104, as amended; Laws 1958, Chapter 2).

"The Board of Regents is, thus, empowered to promulgate and enforce the necessary regulatory measures which the City here assigns exclusively to itself. Nor do we find expressed in our statutes an intention to restrict in any way the powers of the Board over university construction. The fact that certain agencies, including the Board of Regents, have been specifically exempted from supervision by the State Planning and Building Commission·(A.R.S. § 41-571.14) reasonably implies not that control has been transferred to or confirmed in municipalities, but that these agencies are not engaged in activities requiring any supervision or, more applicable here, that the responsibility for and supervision of planning and building are more appropriately delegated to the agencies themselves than to a separate state commission." pp. 305, 310.

The court goes on to hold that the Board of Regents while performing a governmental function is not subject to city control in its construction at Arizona State University.

In *Hall v. City of Taft*, 47 Cal. 2d 177, 302 P.2d 574 (1956), a building contractor brought an action to enjoin the city from enforcing its building ordinance against him in connection with the construction of a public school building. The court held that the public schools of the state were a matter of statewide rather than local or municipal concern. The court also held that the state had completely occupied the field by general laws and that the city could not enact ordinances in conflict therewith. See also *Regents of University of California v. City of Santa Monica*, 77 Cal. App. 3d 130, 143 Cal. Rptr. 276 (1978).

The foregoing cases are representative of many jurisdictions that hold under a variety of different statutes and constitutional provisions and for a variety of reasons that a city may not interfere with construction of state schools when that construction is governed by comprehensive state statutes. Most of the cases depend upon the application of one of the traditional tests of superior sovereign, governmental-proprietary functions, or power of eminent domain. There are also a number of cases involving a variety of statutes, constitutional provisions and rationale which hold directly to the contrary. See *Port Arthur Independent Sch. Dist. v. City of Groves*, 376 S.W.2d 330 (Tex. 1964); *Edmonds Sch. Dist. v. Mountlake*, 77 Wash. 2d 609, 465 P.2d 177 (1970).

In 1 Antieau, Municipal Corporation Law § 3.32 (1980), the author states:

"In most of the cases that have arisen control over public facilities has been ruled a state concern. Referring to the home rule amendment, the Nebraska Court has said: 'The right of the state to legislate upon educational affairs has not been limited by the Constitution. Education . . . is preeminently a state affair.' The Minnesota Court has ruled that a home rule charter provision requiring approval of contemplated buildings by a city planning commission is inapplicable to new school buildings erected by the board of education."

## The same author in § 5.35 states:

"The exercise of municipal power is ineffective and void when it conflicts with state statutes or regulations in the non-home rule states, as well as in the legislative home rule states. In the constitutional home rule states, the exercise of municipal power is void when it conflicts with state laws or regulations on matters of state-wide or general concern."

Thus, regardless of the reasoning of the various courts or the statutory or constitutional provisions in any particular case, the underlying rationale seems to be the same. That is, municipal regulation of school construction is unduly burdensome when such regulation conflicts with a statewide building code administered by the state authority responsible for such construction.

In *Rutgers v. Piluso,* 60 N.J. 142, 286 A.2d 697 (1972), the New Jersey Supreme Court in a land use or zoning case refused to apply any of the traditional tests and adopted a balancing of interests test which has become increasingly popular with the courts. In *Rutgers* the university sought to construct a college dormitory which would not comply with the local zoning regulations of Piscataway Township wherein the dormitory would be located. While the court held in favor of the university, it did so after balancing the interests of the state in its operation of the university against the local interests of the township. The court stated:

"[I]t is apparent that municipal zoning regulation of state university property can, and in the case before us certainly would, very materially interfere with the development and growth of the institution, for the benefit of all the people of the state, as planned and felt necessary by the educational authorities. As the trial court commented: 'The absence of immunity would result in local municipalities controlling virtually every decision concerning physical development of the University.' . . . .

"The question of what governmental units or instrumentalities are immune from municipal land use regulations, and to what extent, is not one properly susceptible of absolute or ritualistic answer. Courts have, however, frequently resolved such conflicts in perhaps too simplistic terms and by the use of labels rather than through reasoned adjudication of the critical question of which governmental interest should prevail in the particular relationship or factual situation."

. . . .

"The rationale which runs through our cases and which we are convinced should furnish the true test of immunity in the first instance, albeit a somewhat nebulous one, is the legislative intent in this regard with respect to the particular agency or function involved. That intent, rarely specifically expressed, is to be divined from a consideration of many factors, with a value judgment reached on an overall evaluation. All possible factors cannot be abstractly catalogued. The most obvious and common ones include the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests. . . . In some instances one factor will be more influential than another or may be so significant as to completely overshadow all others. No one, such as the granting or withholding of the power of eminent domain, is to be thought of as ritualistically required or controlling. And there will undoubtedly be cases, as there have been in the past, where the broader public interest is so important that immunity must be granted even though the local interests may be great. The point is that there is no precise formula or set of criteria which will determine every case mechanically and automatically." pp. 150, 152-153.

Kansas City, in addition to the home rule amendment, relies heavily on *Rutgers* and the recent zoning case of *Brown v. Kansas Forestry, Fish and Game Commission,* 2 Kan. App. 2d 102, 576 P.2d 230 (1978). In *Brown* the state forestry, fish and game commission purchased two lots in 1975 in the middle of a twenty-three lot subdivision near Manhattan which had been zoned for single family residences. The commission intended to use the land for a public parking lot, complete with toilet facilities, for the convenience of its patrons using a fishing and recreation facility on the Big Blue River. The court reviewed some of the common tests to be applied, such as the "superior sovereign test," "the governmental-proprietary test," and the "eminent domain test," and rejected them all in favor of the adoption of a "balancing of interests" test as set forth in *Rutgers.* The Court of Appeals in *Brown* stated:

"In our own analysis we start with the premise that the legislature has not spoken directly on the subject, any more than has our Supreme Court. Under K.S.A. 19-2901, counties are given the power to zone 'for the purpose of promoting the public health, safety, morals, comfort, general welfare and conserving the values of property throughout that portion of any county zoned under the terms of this act . . . .' The county zoning board, under K.S.A. 19-2906, has 'power to determine, restrict and regulate the area within which trade, industries and recreations may be conducted . . . .' On the other hand, under K.S.A. 32-241, the commission is authorized to acquire land for public forestry, recreational

grounds and/or game preserves and 'to provide for keeping, maintaining and improving such public forestry, recreational grounds, fish and game preserves; to establish such public forestry, recreational grounds, fish and game preserves at such place or places within this state as shall, in the judgment of the commission, be most suitable to carry out the intents and purposes of this act    .    .    .    .' There is nothing in the statutes which says the commission is subject to local zoning, nor is there anything which grants it immunity.

"We therefore regard the question as open in this state. Given the choice, we think this case aptly illustrates why the balancing of interests test better promotes the public's interest than any of the traditional mechanical tests.

.    .    .    .

"Dealing with the specifics of this case, we are not talking about establishing a public hunting or fishing facility in an area zoned for agriculture. The merits of such a case appear clear, at least on the surface. Here we are dealing with an all-night parking lot with toilet facilities in the middle of a residential subdivision. The commission anticipates that the recreational facility will be used at a rate of 10,000 man days per year. At least some of those users will employ the proposed parking lot. The merits of this proposal are not nearly so clear. If the facts were fully developed at an evidentiary hearing the location of this particular facility in this particular location might prove to be an arbitrary decision of the commission, unnecessarily impinging on the legitimate expectations of the neighboring landowners and upsetting a carefully conceived local land use plan. On the other hand, it might turn out to be a wholly necessary and beneficial use far outweighing any local concern, for which accommodation should be made by any reasonable zoning body.

"If we look at the factors suggested as relevant by the *Rutgers* court we find: (1) The instrumentality seeking immunity is a state agency, and its judgment is entitled to considerable deference. (2) The general function being performed—promoting recreation—is one of recognized public utility but hardly on a level of importance with public education. The specific use, providing parking space near but not in a recreation area, is of a more marginal public interest. (3) While there is public interest in the proposed use in that some people will find this parking lot more convenient than other available lots, the segment of the population affected is relatively small. (4) Regulation, if rezoning is refused, would have the effect of requiring the parking lot to be located in some area other than a residential subdivision. Such a move might make the lot less convenient, but would probably not substantially impair the usefulness of the recreation area. (5) The proposed use would, prima facie at least, have a substantial adverse impact on the surrounding householders and on the existing land use plan." pp. 112-113.

Kansas City urges that if it does not have absolute power under the home rule amendment, then we should adopt a similar "balancing of interests" test in the determination of whether its building codes apply to the Board of Regents in this case and then makes a strong argument to the effect that the balance weighs in favor of the City. The Board of Regents makes an equally strong argument that in the adoption of such a test it would weigh

heavily in favor of the Board. Whatever may be the merits of such a balancing of interests approach to the use of land by a state agency under city or county zoning laws, we do not feel such a test would be feasible or practical as applied to local building codes and proposed construction by the Board of Regents. For example, the 1980 session of the Legislature authorized and appropriated funds for the Board of Regents to undertake capital improvements in Kansas City, Lawrence, Manhattan, Wichita, Hays and other cities where institutions of higher learning under the control of the Board are located. To say that each of these projects should be delayed until such time as a final court determination could be made whether local building codes were applicable would not only unreasonably delay construction but in these days of uncontrolled inflation might doom the projects altogether. We decline to adopt such a position in this case.

We hold that the Board of Regents, being subject to the comprehensive building construction codes and legislation enacted by the legislature and being charged with the responsibility for all institutions of higher learning in the state and the application of such building codes uniformly thereto, is not required to obtain a building permit or be controlled by the Kansas City building codes for construction at the Kansas University Medical Center. That is not to say that there should not be cooperation between the Board of Regents and the City officials and we would assume that such cooperation would be forthcoming and will be beneficial to both. Indeed, K.S.A. 31-137 places a duty upon the City to enforce compliance with the provisions of K.S.A. 31-132 *et seq.* It is obvious that the two have worked in harmony in many areas through the years and that spirit of mutual respect and consideration of one for the other should, and we assume will, continue. In closing, we deem the following quote from *Rutgers v. Piluso* appropriate:

"It is, however, most important to stress that such immunity in any situation is not completely unbridled. Even where it is found to exist, it must not, as this court said in *Washington Township v. Village of Ridgewood, supra* (26 N.J. at 584-586, [141 A.2d 308]), be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interests. This rule must apply to the state and its instrumentalities as well as to lesser governmental entities entitled to immunity. For example, it would be arbitrary, if the state proposed to erect an office building in the crowded business district of a city where provision for off-street parking was required, for the state not to make some reasonable provision in that respect. And, at the very least, even if the proposed action of the

immune governmental instrumentality does not reach the unreasonable stage for any sufficient reason, the instrumentality ought to consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible." 60 N.J. at 153-154.

We have carefully considered all of the arguments and authorities of both parties but in view of our holding, there would be nothing gained by extending this opinion further.

The judgment of the trial court is reversed and the case remanded with directions to enter judgment in favor of the plaintiff.

HERD, J.: I respectfully dissent. Cities and counties are statutorily charged with the responsibility for urban planning. Regulations pertaining to zoning and building codes were enacted by the city pursuant to the city's power to control such planning. There should be no exemptions. The majority opinion creates one. Appellant pays no local taxes. In spite of the fact the city is required to inspect buildings and furnish initial sewer, water and electrical service installation and fire and police protection all at no cost to the State of Kansas, appellant objects to obtaining a building permit and paying an inspection fee. I believe appellant should conform to the building code. I would affirm the trial court.